[Cite as *Hunter v. Troutman*, 2025-Ohio-366.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

MICHELLE A. HUNTER, :

      Plaintiff-Appellant/ :
      Cross-Appellee,

       :       No. 113524

      v.

       :

HOLDEN K. TROUTMAN, :

      Defendant-Appellee/ :
      Cross-Appellant. :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
             AND REMANDED
**RELEASED AND JOURNALIZED:** February 6, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-20-380424

***Appearances:***

Taft Stettinius & Hollister LLP and Jill Friedman
Helfman, *for appellant/cross-appellee.*

Stafford Law Co., L.P.A., Joseph G. Stafford, and Nicole A.
Cruz, *for appellee/cross-appellant.*

LISA B. FORBES, J.:

{¶ 1} Plaintiff-appellant/cross-appellee Michelle A. Hunter ("Michelle")

appeals the trial court's December 27, 2023 judgment of divorce. Michelle contends

that the trial court erred when it (1) found she committed financial misconduct, (2) ordered the sale of the Lee Road residence and awarded all proceeds to defendant-appellee/cross-appellant Holden K. Troutman ("Holden"), and (3) ordered Michelle to pay all of Holden's attorney's fees.

{¶ 2} Holden filed a cross-appeal contending that the trial court erred when it (1) imposed arbitrary time restrictions on the presentation of evidence, (2) improperly identified and divided marital property and did not award Holden a distributive award, and (3) failed to award Holden spousal support.

{¶ 3} For the reasons that follow, we affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

## I. Factual and Procedural History

{¶ 4} Michelle and Holden were married on September 15, 2015. Michelle and Holden did not have any children during their four and one-half year marriage. On February 18, 2020, Michelle filed a pro se complaint for divorce, and on July 24, 2020, Holden filed a pro se answer. On October 23, 2020, the parties separated allegedly due to Holden's womanizing and addiction problems. On the same date, Holden retained counsel, and on November 18, 2020, Michelle retained counsel.

{¶ 5} The parties filed numerous motions during the pendency of this case. We will note those relevant to the issues raised on appeal.

{¶ 6} On November 20, 2020, Holden filed a motion seeking a temporary order of spousal support. The parties fully briefed the issue, and on February 17, 2021, the trial court denied the motion. On February 18, 2021, Holden requested a

full evidentiary hearing on the matter of temporary spousal support. The court conducted a hearing and found neither party had a verifiable source of recurring income and, therefore, denied Holden's request for spousal support.

{¶ 7} On February 25, 2021, Holden filed a motion for leave to file an amended answer and counterclaim instanter, which the trial court granted. On March 4, 2021, Michelle filed a motion for leave to file an amended complaint instanter, which the trial court granted. On June 18, 2021, Holden answered the amended complaint and filed a counterclaim.

{¶ 8} On July 29, 2021, Holden filed a motion to add new party defendants Nathaniel Eatman ("Nathaniel") — Michelle's father; Nicole Kerkian ("Nicole"), Ian Stanich ("Ian"), and Courtney Stanich ("Courtney") — Michelle's three adult children; Horizon Health Services, LLC ("Horizon") — Nathaniel's business; and Snap Medics, LLC ("Snap Medics") — Michelle and Holden's business (collectively "third-party defendants"). Holden claimed the third-party defendants possessed funds, financial accounts, personal property, real property, and/or other assets that were marital in nature and, therefore, subject to division. On August 19, 2021, the trial court granted Holden's motion to add the third-party defendants.

{¶ 9} The trial court denied Holden's renewed motion for temporary support on February 16, 2022.

{¶ 10} Michelle filed a financial disclosure statement on December 7, 2022. Holden never filed a financial disclosure statement during the pendency of the divorce proceedings.

**{¶ 11}** The court conducted trial on the following days: December 13, 2022, December 16, 2022, March 2, 2023, and March 28, 2023.

**{¶ 12}** During trial, the parties addressed assets — including homes, vehicles, and businesses — and temporary spousal support. Michelle's and Holden's testimony varied greatly on whether Michelle earned income during their marriage.

**A. Income**

**{¶ 13}** Michelle testified that she was not employed but she performed consulting work, pro bono, for her family's businesses. Michelle further testified that during their marriage, Holden was the primary financial supporter who was employed by Horizon, a multimillion-dollar business owned and operated by her father, Nathaniel.

**{¶ 14}** Michelle testified that Horizon employed Holden from 2012 through 2020 in various roles including the manager of maintenance staff, marketing, sales, and construction work. Holden earned the following wages from Horizon: $504,000 in 2014, $756,000 in 2015, $758,000 in 2016, $10,000 in 2017, $30,000 in 2018, and $477,600 in 2020; Holden received no wages in 2019. Michelle testified that Holden's income decreased in years when his work performance was adversely impacted by addiction.

**{¶ 15}** Holden stated he was diagnosed in 2018 with heart failure that prevented him from working, although he admitted he had opened several businesses following his diagnosis and he made substantial earnings in 2020. Michelle testified that from October 2020 through December 2020, due to Holden's

"bad behavior," she had a portion of his payroll checks deposited into her checking account so that she could pay their household bills. Holden argued the deposits indicated Michelle was a salaried employee.

{¶ 16} According to Michelle, Holden stopped providing financially for her in December 2020 and since that time she has been supported financially by her father, Nathaniel. Michelle testified that she has free access to Nathaniel's credit card, Bank of America checking account ("BOA account") for which he leaves her signed checks to use at her own discretion, and a substantial monthly allowance. Michelle also testified that Nathaniel transfers money into her checking account if she needs additional funds.

{¶ 17} Holden testified that Michelle lies and avoids personal income so that she does not have to pay restitution imposed on her in a prior federal lawsuit:[1]

> DEFENSE COUNSEL: What keeps — what keeps your wife having things in her name?
>
> HOLDEN: It is my understanding because she has a debt with the Justice Department and is not supposed to receive income.

{¶ 18} Holden claimed that, while Nathaniel and other family members technically own Horizon and the other family businesses, Michelle makes the

---

[1] In 2005, in case No. 1:04CR564-001, in U.S. District Court, N.D. Ohio, Michelle pleaded guilty to bank fraud, aiding and abetting; fraudulent receipt of bankruptcy property, aiding and abetting; concealment of property belonging to bankruptcy estate; and false statements relating to health care matters. The court sentenced Michelle to 37 months in prison, ordered her to pay approximately $6.3 million in restitution, and precluded her from conducting business in the health care industry. Michelle now pays $150 per month in satisfaction of her restitution order.

executive decisions and controls the transfer of funds and payment of bills from business accounts:

> DEFENSE COUNSEL: Now, sir, in terms of the way she operates, how does she operate with the monies that comes in from these businesses to her? Tell us how the conspiracy works?
>
> HOLDEN: Well, I was employed as her husband as referred to as one of the managing partners, and I started receiving salary that she was receiving before I came along somehow. They gave her direct access to it because that's why we shared bank accounts. And other funds were just paid directly from the business for any other things that need to be purchased or other bills.
>
> . . .
>
> DEFENSE COUNSEL: What's the relationship between your wife and her father as far as who runs the businesses? Who does what at the direction of whom?
>
> . . .
>
> HOLDEN: Everything — well there's some entities that are technically owned on paper by her father, but he doesn't do anything with the businesses, [Michelle] runs the companies.

{¶ 19} According to Holden, Michelle titled the family companies and their assets in her family members' names — including Holden's name — and paid the family members exorbitant salaries from Horizon. In turn, those family members purchased homes and vehicles for Michelle's personal use. Holden further testified that Michelle opens bank accounts with her children so that she can access the funds:

> DEFENSE COUNSEL: The wife has different people on different bank accounts, is that accurate?
>
> HOLDEN: Yes.

DEFENSE COUNSEL: Why does she do that? Why does she put other people's names on bank accounts that she either owns, deposits, or controls?

HOLDEN: To allow her access to them.

. . .

DEFENSE COUNSEL: And how supportive are her children in concealing monies that she has?

HOLDEN: Well, they know everything that's going on and they make sure she has access. That's why they allow their names to be on all the accounts.

Michelle denied that she earned or hid income from Horizon.

{¶ 20} In March 2023, Holden stated he was living on public assistance and he received help from friends and family. Holden acknowledged that Horizon was in existence prior to their marriage but he, nonetheless, considers it a marital asset because he assisted with the business.

{¶ 21} Holden testified that during his employment with Horizon he was referred to as a managing partner and received a salary that Michelle could access from their joint bank account. He further testified that company funds were used to pay any bills incurred by him or Michelle, such as mortgages and car loans. Holden testified that after he and Michelle separated, he was terminated from Horizon in November 2020, his health insurance was cancelled, and his bank accounts that were jointly in his and Michelle's names were emptied.

## B. Snap Medics

{¶ 22} Michelle and Holden both testified about Snap Medics, a company they started in 2018, with the intent to develop a telemedicine app. Michelle's

answers to Holden's first set of interrogatories stated her employment with Snap Medics ended in November 2020. She also testified at trial that Snap Medics was not operational as of February 2, 2021.

### C. PPP Loans

{¶ 23} On May 22, 2020, Michelle completed an application for a Federal Paycheck Protection Program loan ("PPP loan") for Snap Medics, and the company received a PPP loan in the amount of $261,760. W-2 forms show Michelle and Holden earned $53,000 and $38,000, respectively, from Snap Medics in 2020.

{¶ 24} While Michelle represented to the trial court that Snap Medics ceased to operate in November 2020 or February 2021, the record demonstrates she completed a second PPP loan application on behalf of the company on May 5, 2021. The company received a corresponding loan in the amount of $239,500. Both PPP loans were forgiven by the Small Business Association. Additionally, Snap Medics' payroll records indicate payroll continued into 2021, and bank statements show Nicole, Courtney, and Ian received payroll deposits from Snap Medics through September 2021.

{¶ 25} Holden testified that he was unaware of Snap Medics' receipt of either PPP loan, and he did not receive income from the company after 2020.

{¶ 26} In addition to the PPP loans for Snap Medics, Michelle completed and submitted applications for several family businesses seeking PPP loans. At trial, Michelle denied that she completed the applications, but the record demonstrates that in 2020, Michelle completed PPP loan applications as a consultant for Four

Seasons Health Services, LLC; Generations Health Services, LLC; and Horizon Health Service LLC ("the family companies"). The record also shows that the companies applied for and received PPP loans in 2021, although the name of the individual who completed the applications was not provided. Michelle testified that the family companies — not Michelle — received $4.6 million in PPP loans and the funds were used to meet payroll. Holden argued the $4.6 million PPP loans constituted marital property.

**D. Real Estate**

{¶ 27} Michelle held no real estate in her name. Michelle testified that during the marriage, she and Holden lived primarily at a home located on Brigham Road in Gates Mills, Ohio ("Gates Mills residence") that is titled to Michelle's daughter, Nicole, and Nicole's husband. On October 23, 2020, when Michelle and Holden separated, Michelle remained in the Gates Mills residence, and Holden moved to a house he owned on South Woodland Road in Shaker Heights, Ohio ("South Woodland residence"). Michelle stated that it was difficult to live at the Gates Mills residence alone so she would move back and forth between that home and another home owned by Holden and situated on Lee Road in Shaker Heights ("Lee Road residence"), living at both homes with Nicole, Nicole's husband, and Nicole's daughter.

{¶ 28} Holden remained in the South Woodland residence, where he lived during the pendency of the divorce with his girlfriend, their child who was born during the divorce proceedings, and the girlfriend's two children.

{¶ 29} Both the South Woodland and Lee Road residences were acquired during the marriage. Holden purchased the South Woodland residence on October 28, 2016, for $765,000, and title was subsequently transferred on November 22, 2016, to Holden's trust. Nathaniel purchased the Lee Road residence on June 12, 2015, for $998,000, and transferred title to Holden on September 23, 2016; title was then transferred to Holden's trust on November 22, 2016. At the time of trial, the Lee Road residence was encumbered by a mortgage in both Holden's and Nathaniel's names and a home equity line of credit ("HELOC") in Holden's name. Michelle testified that Nathaniel made all the mortgage payments on the Lee Road residence. As of December 1, 2020, the outstanding principal due on the Lee Road mortgage totaled $599,995.89, and as of November 20, 2020, the HELOC had an outstanding balance of $147,257.09. Both the South Woodland and Lee Road residences were subject to foreclosure actions at the time of the divorce proceedings. *See CFBank, Natl. Assn. v. Holden K. Troutman*, Cuyahoga C.P. No. CV-21-955972.

**E. Vehicles**

{¶ 30} The trial court awarded the parties four vehicles as part of the divorce decree: a 2018 Mercedes Benz G ("2018 Mercedes Benz"), a 2020 BMW Z4 ("BMW"), a 2016 Audi RS7 ("Audi"), and a 2012 Mini Cooper Countryman ("Mini Cooper"). Michelle testified that the 2018 Mercedes Benz was titled solely in her name and the loan — with a balance of $109,112.06 as of December 3, 2020 — was paid by her father, Nathaniel, since she had no income. The BMW was titled to Snap

Medics, Michelle and Holden's business, and as of November 28, 2020, was encumbered with a loan totaling $36,982.13. Michelle and Holden also held title to the Audi. Individually, Holden held title to the Mini Cooper.

### F. Nathaniel Eatman

{¶ 31} Nathaniel testified via Zoom from California where he has lived off and on since 2000. Nathaniel testified that he acquired Horizon in 2006, and he operates the company without Michelle's assistance. Nathaniel denied he held the company in name only while Michelle operated the business. At 86 years old, Nathaniel stated he works 10 to 15 hours a week and is able to complete his role remotely.

{¶ 32} Nathaniel testified that he financially supports his family; he assists his grandchildren with purchasing homes and provides them with the highest possible income that Horizon can afford. Nathaniel stated he leaves signed checks in Ohio, from his own checking account, and Michelle has authorization to write checks, in any amount, at her discretion. Nathaniel also provides Michelle with a credit card that she can use freely. Nathaniel testified that family members transfer funds into Nathaniel's account to ensure there are sufficient funds to cover the checks that have been written from his account, yet he denied transfers from Horizon into his account were intended to cover all of Michelle's expenditures. Nathaniel testified that sometimes he knows to whom the checks Michelle drafts are written:

> DEFENSE COUNSEL: So what happens, let me just make sure. The handwriting on these checks are all different. There's your signature

and then your daughter, the criminal, fills it out for whatever she needs, correct? Correct?

NATHANIEL: Correct.

DEFENSE COUNSEL: And then they transfer the money into your account to cover all the checks they write, checks for, correct?

NATHANIEL: Yes.

DEFENSE COUNSEL: You have no idea what they're writing checks for, correct?

NATHANIEL: Some yes, some no.

DEFENSE COUNSEL: And then when they transfer money in the account you have no idea why they're transferring money into the account, correct? Pay me by putting the money in my account.

NATHANIEL: Well, it's my money, it's the way they that's your story, right?

DEFENSE COUNSEL: You get paid by them transferring money, that's your story, right?

NATHANIEL: Yes.

DEFENSE COUNSEL: And so when they transfer 80,000, 75,000, 20,000, you're going to tell me that's your payroll, right? Transferring the money, correct?

NATHANIEL: Yes.

{¶ 33} Nathaniel conceded that all the charges in the BOA statement are Michelle's. Nathaniel also testified that the BOA account pays for the Lee Road and Gates Mills mortgages.

{¶ 34} Nathaniel testified that he did not authorize Michelle to apply for PPP loans for the family companies, and he denied that Michelle completed the loan application forms or applied in his name. Nathaniel did not know who had applied

for the PPP loans on behalf of the family companies. Nathaniel testified that Horizon used the PPP loan proceeds in payment of payroll.

{¶ 35} According to Nathaniel, Horizon paid Holden's high salary in 2014-2016 and 2020, because Holden renovated properties and scouted new home health care businesses that Horizon could potentially acquire. Nathaniel testified that he is paying all of his family member's attorney's fees — Michelle's and her children — because he has the means to do so.

{¶ 36} During Nathaniel's testimony, the magistrate noted that the witness was responsive to his own attorney's questions, answering quickly and easily, but did not respond in the same fashion when cross-examined.

### G. Michelle's children

{¶ 37} Michelle's adult children, Nicole, Courtney, and Ian, testified at trial. Nicole testified that she holds the titles to the Gates Mills residence and a home on Lakeshore Boulevard in Bratenahl, Ohio ("Lakeshore residence"). Nicole stated Nathaniel provided her the funds to acquire the properties. According to Nicole, Michelle lives with her and her family at the Gates Mills and Lee Road residences, and Holden attempted to evict them from the Lee Road residence.

{¶ 38} Nicole testified that she purchased a $251,000 2021 Mercedes Benz G-Wagon ("Mercedes Benz G-Wagon") for Michelle's use, although Nicole makes the monthly car payments. Nicole testified that Michelle does not earn income and does not work at Horizon or any of the family businesses. Nicole testified that she dropped out of college and, with Michelle acting as a consultant, started Four

Seasons Health Services. Nicole further testified that while Michelle was not a Horizon employee, she would show up at the business offices to spend time with Holden, visit family, or answer questions for her family. Nicole's testimony about her own income was evasive, first stating she earned "about $250,000." When presented with a document she signed when purchasing the Mercedes Benz G-Wagon that stated her salary was $485,000, Nicole said she must have misspoken when she testified to the lower salary. Nicole testified that Nathaniel pays Michelle's bills and provides her an allowance.

{¶ 39} Courtney testified that she earns annually "around $200,000" from Horizon and, as part of the accounting department, she is responsible for paying Horizon's bills. According to Courtney, she and Nathaniel have authority to issue payments on behalf of the company. Courtney denied that Michelle could have Horizon checks issued to pay her personal bills and stated Michelle does not use a company credit card. Courtney did not know whether Michelle received money from Nathaniel. Courtney denied that Nathaniel received a paycheck from Horizon.

{¶ 40} Ian was uncertain of the exact salaries he and his wife earned from Horizon. Ian testified that he believed one of his sisters was paying for his attorney's fees although he did not know the source of the funds to pay those bills.

{¶ 41} All of Michelle's children denied that they engaged in a conspiracy or scam to receive income from Horizon, in lieu of Horizon paying income to Michelle, and then used those funds to purchase items for Michelle.

### H. Michelle Absconds with the Audi

{¶ 42} During the divorce proceedings, Holden had possession of the Audi that was titled to Snap Medics. On May 20, 2021, Michelle sought an emergency ex parte restraining order to prevent Holden or any other person from operating the Audi; she requested the trial court order the immediate sale of the vehicle with the proceeds to be held for distribution. In support of her motion, Michelle argued that Holden allowed the car insurance on the Audi to lapse and, as a result, Michelle was subject to potential liability if the vehicle was involved in an automobile accident. Michelle further argued an accident was a viable concern since Holden was cited for speeding on March 30, 2019, and operating a vehicle under the influence, speeding, and reckless operation on June 22, 2020. The trial court never ruled on Michelle's motion.

{¶ 43} On August 8, 2022, Michelle entered Holden's South Woodland residence and, without consent, removed the Audi and drove the vehicle to Chicago where she left it in storage.

{¶ 44} On September 12, 2022, Holden filed a motion alleging Michelle removed his Audi from his property without consent and requesting the court order Michelle to return the vehicle. The next day the trial court ordered Michelle to return the vehicle and granted Holden's motion for an ex parte temporary restraining order enjoining Michelle from entering Holden's property. On September 20, 2022, Holden filed a motion to show cause stating the Audi had not been returned.

{¶ 45} The trial court heard testimony on Holden's motion to show cause on March 2, 2023. Michelle stated that she removed the Audi from Holden's garage because Holden received a DUI, she believed the Audi was uninsured, and she was concerned about her personal liability if Holden was involved in an automobile accident while driving the vehicle. Michelle admitted she had not returned the Audi, claiming she was unable to transport the vehicle because it had been reported stolen.

{¶ 46} The magistrate's decision filed on March 3, 2023, recommended a finding of contempt and ordered the return of the vehicle as a purge condition. After the conclusion of trial, the magistrate filed his decision on July 27, 2023, and Michelle filed her objections on August 10, 2023. Only after the court overruled Michelle's objections to the magistrate's decision on December 27, 2023, was the Audi returned.

## I. Attorney's Fees

{¶ 47} At trial, defense counsel testified that Holden had incurred $118,406.40 in legal fees and expenses between October 13, 2020, and December 12, 2022, and presented exhibit PPP in support of that testimony, describing exhibit PPP as a fee statement. Michelle's counsel cross-examined defense counsel regarding the proffered attorney's fees. Holden testified that he had paid approximately $6,000 of his attorney's fees and was unable to pay the remaining balance.

{¶ 48} On March 7, 2023, Holden filed a notice with the court that he served opposing counsel with a supplemental attorney's fee bill but did not attach the

supplemental bill to the pleading. In his proposed findings of fact and conclusions of law filed on June 20, 2023, Holden referenced exhibit PPP(1), a supplemental fee bill in the amount of $192,960.22, that again was not attached as an exhibit or made part of the record.

### J. Post-trial Proceedings

{¶ 49} Following trial, the court ordered the parties to submit written closing arguments and proposed findings of fact and conclusions of law. On May 15, 2023, Michelle filed the ordered documents, and following a grant of an extension of time, Holden filed his documents on June 20, 2023.

{¶ 50} On July 27, 2023, the magistrate issued a decision to which both parties filed objections, and on December 27, 2023, the trial court issued a judgment entry on the parties' objections. On the same date, the trial court also issued a judgment entry that adopted the magistrate's July 27, 2023 judgment entry ("December 27, 2023 divorce decree") in its entirety, except for noted changes, granted the parties' divorce, and ordered the division of property.

{¶ 51} The trial court gave no weight to Michelle's testimony and "little weight" to Holden's testimony in light of credibility issues presented by both. Prior to their marriage, both Michelle and Holden were convicted of unrelated felony offenses. As to Holden's credibility, the record shows Holden was dishonest during his prior divorce proceedings; Holden was still legally married to his former wife when he and Michelle first married; Holden held and used two social security numbers; Holden has been known by three names with two of the name changes

occurring within one year; Holden falsely denied he was a convicted felon when he purchased a firearm; and Holden stated in his November 20, 2020 motion for temporary support that he earned no income in 2020 yet his tax returns for that year reflected income of $477,600. Michelle was not forthcoming as to her involvement with the PPP loan applications; she absconded with the Audi from Holden's garage without his permission; and she indicated Snap Medics stopped operating in November 2020 or February 2021 yet payroll continued to her family members into 2021.

{¶ 52} The trial court found Michelle committed financial misconduct through her nondisclosure and concealment of marital assets and income. Specifically, the trial court found financial misconduct when Michelle testified she did not work and had no income or assets yet she had full access to Nathaniel's BOA account. The trial court stated Nathaniel's 2020 tax return showed $40,000 annual income that could not support the funds present in his BOA account, which Michelle accessed on a regular basis:

> Plaintiff repeatedly testified that she does not work and has no income or assets. Despite this testimony, Plaintiff lives a lifestyle that indicates substantial wealth and/or income. When questioned, Plaintiff claimed to be living off an allowance provided by her father, Nathaniel Eatman. However, a review of Mr. Eatman's tax returns indicates that he only claims income of approximately $40,000.00 annually. Further, when questioned regarding numerous checks and transactions on his accounts on behalf of Plaintiff, Mr. Eatman had no recollection of them. The evidence indicates that Plaintiff herself was solely using these accounts and that they were Mr. Eatman's in name only.

Dec. 27, 2023 judgment entry, p. 14.

{¶ 53} The trial court found Michelle committed financial misconduct in light of her testimony that as of November 2020 or February 2021, she no longer owned Snap Medics nor derived income from Snap Medics, but she applied for and received PPP loans on behalf of the company in May 2021:

> Further, Plaintiff testified that she and Defendant owned a company called Snap Medics, LLC prior to the divorce. A review of Plaintiffs financial disclosures indicates that Plaintiff no longer owned the company, nor derived income from the company. However, during trial evidence was presented that Plaintiff applied for Federal Paycheck Protection Program ("PPP") loans for Snap Medics.

Dec. 27, 2023 judgment entry, p. 14.

{¶ 54} The trial court also found financial misconduct by Michelle because she applied for PPP loans for Horizon and held herself out as a representative of the company indicating that she had access to the company's funds while testifying that she did not work for Horizon:

> Evidence was presented that Plaintiff applied for PPP loans on behalf of Horizon Health Services and would hold herself out as a representative of the business. Plaintiff clearly has substantial assets at her disposal but has gone to great lengths to conceal these assets from Defendant and the creditors to whom she owes restitution from her criminal conviction. An award of a greater portion of the marital estate to Defendant is necessary to create an equitable division of the property.

Dec. 27, 2023 judgment entry, p. 14.

{¶ 55} The trial court further concluded Michelle committed financial misconduct when she entered Holden's residence, without consent, and removed the Audi. Due to Michelle's financial misconduct, the trial court awarded Holden the Audi. Due to Michelle's financial misconduct and her failure to abide by court

orders requiring her to return the Audi to Holden, the court also awarded Holden attorney's fees in the amount of $192,960.22.

{¶ 56} The court classified as marital property the Lee Road and South Woodland residences. The trial court ordered the immediate sale of the Lee Road residence, with the proceeds to be used to pay the outstanding mortgage and HELOC. As a further sanction for Michelle's financial misconduct, the trial court held that any additional proceeds after the satisfaction of the loans were to be allocated to Holden.[2] Any costs or expenses associated with the foreclosure action on the property were the sole responsibility of Michelle. The trial court valued the Lee Road residence at $1,082,400.

{¶ 57} The trial court awarded Holden the South Woodland residence and ordered that Michelle was responsible for any debts and liabilities associated with the property's foreclosure. The trial court valued the South Woodland residence at $712,500. The trial court awarded the South Woodland residence to Holden after concluding Michelle had engaged in financial misconduct.

{¶ 58} The court found four vehicles constituted marital property: the Mini Cooper valued at $9,000, the 2018 Mercedes Benz valued at $90,000, the BMW valued at $40,000, and the Audi, valued at $50,000. The court awarded Michelle the 2018 Mercedes Benz and the BMW; Holden was awarded the Mini Cooper and, as noted, the Audi.

---

[2] The magistrate's July 27, 2023 decision also awarded Holden a distributive award in the amount of $100,000 — in addition to the South Woodland residence and Audi — that the trial court found contrary to R.C. 3105.171(E)(4) and eliminated.

{¶ 59} The court awarded the parties the personal property currently in their possession and, because Michelle and Holden did not hold any joint financial accounts, they were ordered to retain the accounts currently in their names. The court found neither Michelle nor Holden had any ownership interest in any businesses that were marital in nature and subject to division.

{¶ 60} Pursuant to the R.C. 3105.18(C) factors, the court found an award of spousal support was not reasonable or appropriate.

{¶ 61} It is from the trial court's December 27, 2023 judgment entry regarding objections to the magistrate's decision and the trial court's December 27, 2023 judgment entry (divorce decree) that the current appeal arises. On December 28, 2023, Michelle filed a timely appeal, presenting three assignments of error:[3]

---

[3] On the same date that Michelle filed her appeal, she also filed with the trial court a motion to stay the judgment entry of divorce; the trial court denied the motion. On January 3, Michelle filed with this court a motion to stay the trial court's December 27, 2023 judgment entry pending the appeal. On January 29, 2024, after the issue was fully briefed, this court denied the motion.

On February 9, 2024, Michelle filed a complaint for writ of mandamus, writ of supersedeas, and alternate writ with the Ohio Supreme Court. *State ex. Rel. Michelle A. Hunter v. Judge Francine B. Goldberg,* Case No. 2024-0205. On February 29, 2024, the Ohio Supreme Court granted Michelle's emergency motion for alternative writ and/or temporary stay of judgment pending resolution of the action filed before it.

On July 19, 2024, Holden filed with this court a motion for clarification inquiring whether this court had jurisdiction over the pending case at the same time the Ohio Supreme Court entertained Michelle's emergency motion. On July 26, 2024, this court denied Holden's motion for clarification, and conducted oral arguments on July 31, 2024.

On October 17, 2024, the Ohio Supreme Court denied the writs of mandamus and supersedeas and lifted the stay it had imposed on February 29, 2024. *State ex Rel. Michelle A. Hunter v. Judge Francine B. Goldberg,* 2024-Ohio-4970.

Assignment of Error I:  The trial court erred when it found that appellant committed financial misconduct.

Assignment of Error II:  The trial court erred when it ordered the sale of the Lee Road residence and awarded all of the proceeds to be paid to appellee.

Assignment of Error III:  The trial court erred when it ordered appellant to pay appellee's attorney's fees.

{¶ 62} On January 24, 2024, Holden filed a cross-appeal with this court presenting three cross-assignment of errors:

Cross-Assignment of Error I:  The trial court erred as a matter of law and abused its discretion by placing arbitrary time restrictions upon the presentation of evidence and by violating Holden's due process rights.

Cross-Assignment of Error II:  The trial court erred as a matter of law and abused its discretion in its identification and division of marital property, and by failing to award Holden a proper and just distributive award.

Cross-Assignment of Error III:  The trial court erred as a matter of law and abused its discretion by failing to award Holden spousal support, including temporary spousal support.

## II.  Legal Analysis

{¶ 63} Domestic relations courts must have discretion to do what is equitable upon the facts and circumstances of each divorce case.  *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989).  We, therefore, generally review a trial court's determination in domestic relations cases for an abuse of discretion.  *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 130 (1989).

{¶ 64} A court abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority.  *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.  The term abuse of discretion implies

that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983); *Johnson*. There is no abuse of discretion where the record contains competent, credible evidence to support the trial court's decision. *Trolli v. Trolli*, 2015-Ohio-4487, ¶ 29 (8th Dist.), citing *Kapadia v. Kapadia*, 2011-Ohio-2255, ¶ 24 (8th Dist.). When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

### A. Michelle's Assignments of Error

#### 1. Financial Misconduct

{¶ 65} In her first assignment of error, Michelle argues the trial court erred when it found she committed financial misconduct. We agree with the trial court's finding that Michelle engaged in financial misconduct as relates to her nondisclosure and concealment of marital assets and income. However, we find the trial court erred when it found that Snap Medics was not a legitimate business.

{¶ 66} R.C. 3105.171(E)(4) provides that if a spouse has engaged in financial misconduct, including but not limited to the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property. "A spouse commits 'financial misconduct' where he or she engages in intentional conduct by which he or she either profits from the misconduct or intentionally defeats the other spouse's interest in marital assets." *Victor v. Kaplan*, 2020-Ohio-3116, ¶ 138 (8th

Dist.), citing *Rodgers v. Rodgers*, 2017-Ohio-7886, ¶ 30 (8th Dist.). The complaining spouse bears the burden of proving the financial misconduct. *Id.*

{¶ 67} "'[T]he trial court must indicate the basis for its [decision] in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law.'" *Haynes v. Haynes*, 2009-Ohio-5360, ¶ 41 (8th Dist.), quoting *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97 (1988).

### a. Nondisclosed Income

{¶ 68} Initially, the trial court determined Michelle and Holden lacked credibility and, in fact, gave no weight to Michelle's testimony:

> The Court finds that both [Michelle] and [Holden] were at times evasive and inconsistent in their testimony and therefore little weight shall be given to their testimony. However, the Court additionally and expressly finds [Michelle] to be among the least credible, if not the least credible witness it has ever encountered. No weight can be given to [Michelle's] testimony, and [Michelle's] clearly untruthful actions and statements have unequivocally served to frustrate the process of this litigation for both [Holden] and this Court.

July 27, 2023 judgment entry, p. 10. As noted, this court is limited to "determining under the totality of the circumstances whether the trial court abused its discretion." *Tarachiu v. Tarachiu*, 1995 Ohio App. LEXIS 2487, *10 (8th Dist. June 15, 1995). In an abuse-of-discretion review, this court has recognized that "'[t]his highly deferential standard of review rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures, and attitude.'" *A.Y. v. E.Y.,* 2023-Ohio-1671, ¶ 18 (8th Dist.), quoting *In re L.S.,* 2003-Ohio-2045, ¶ 12 (8th Dist.).

**{¶ 69}** As to Michelle's receipt of income, the trial court found the BOA account was a source of income to her though it was held in Nathaniel's name only:

> [Michelle] repeatedly testified that she does not work and has no income or assets. Despite this testimony, [Michelle] lives a lifestyle that indicates substantial wealth and/or income. When questioned, [Michelle] claimed to be living off an allowance provided by her father, Nathaniel Eatman. However, a review of [Nathaniel]'s tax returns indicates that he only claims income of approximately $40,000.00 annually. Further, when questioned regarding numerous checks and transactions on his accounts on behalf of [Michelle], [Nathaniel] had no recollection of them. The evidence indicates that [Michelle] herself was solely using these accounts and that they were [Nathaniel]'s in name only.

Dec. 27, 2023 divorce decree, p. 14.[4] Based upon the court's conclusions that the BOA account was used solely by Michelle; Michelle completed PPP loan applications on behalf of the family companies and Snap Medics; Michelle represented on a BMW purchase agreement that she earned a substantial income from Snap Medics despite her testimony to the contrary; and Nathaniel's tax returns reflecting minimal income relative to the amounts available in his BOA account, the trial court determined Michelle committed financial misconduct and awarded Holden a greater portion of the marital estate.[5]

---

[4] The trial court's reliance on Nathaniel's 2020 tax return in connection with assessing Michelle's receipt of income from Horizon was misplaced. Nathaniel's 2020 tax return reflected income earned by Nathaniel in 2019. In contrast, the BOA bank records showed activity in Nathaniel's bank account from 2021 through 2023.

[5] The court also found Michelle committed financial misconduct when she absconded with the Audi. July 27, 2023 magistrate's decision, p. 15, adopted by trial court's December 27, 2023 judgment of divorce. Michelle does not dispute that finding in this assignment of error and, therefore, we do not address it.

{¶ 70} Our review of the record supports the trial court's conclusion that Michelle committed financial misconduct as demonstrated through the testimony of Michelle, Holden, Nathaniel, and Courtney as well as the BOA records, Nathaniel's tax records, Michelle's checking account records, PPP loan applications, and the BMW purchase agreement.

{¶ 71} Michelle testified she did not "have any income" during her marriage to Holden — except from Snap Medics in 2020 — and, in turn, she submitted no tax returns during her marriage:

> DEFENSE COUNSEL: Other than the work that you testified you performed for Snap Medics, have you been employed at all from the time of your marriage in 2015 to the present?
>
> MICHELLE: No.
>
> DEFENSE COUNSEL: Why not?
>
> MICHELLE: When I — when I thought about what I could do, I felt it was best and my family agreed that I work from home and that I consult with them as needed on their businesses.
>
> DEFENSE COUNSEL: Do you get paid for this work?
>
> MICHELLE: No.
>
> DEFENSE COUNSEL: Have you ever gotten paid for this work?
>
> MICHELLE: No.
>
> DEFENSE COUNSEL: So how do you support yourself?
>
> MICHELLE: Well, I — I guess I don't. My dad takes care of my bills now. Prior to that, I was married.
>
> DEFENSE COUNSEL: Well who was taking care of your bills while you were married to Holden?
>
> MICHELLE: Holden. Holden.

DEFENSE COUNSEL: Who if anyone was the primary financial support of your family, you and Holden during the marriage?

MICHELLE: Holden was.

{¶ 72} The record includes Michelle's checking account statements from October 2020 through October 2021. Michelle testified that due to Holden's "bad behavior" a portion of his Horizon paycheck was deposited biweekly into her checking account from October 2020 through approximately December 2020. During that timeframe, Michelle's checking account records show four "Horizon Health S. payroll" deposits in the amount of $13,118.71 and one deposit in the amount of $15,597.06. An additional deposit was made on January 29, 2021, from "Horizon Skilled Cons. CP"; no one questioned Michelle about this deposit. The trial court placed no credence on Michelle's testimony, and our review of the record provides no reason for us to reach another conclusion.

{¶ 73} Nathaniel confirmed that Michelle had unrestricted access to his BOA account and credit card. Nathaniel left signed checks in Ohio for Michelle's unsupervised use. Nathaniel testified that he is familiar with some of the checks written by Michelle but not all of them. Nathaniel further testified his BOA account was funded by Horizon and he authorizes Courtney to facilitate the transfers:

DEFENSE COUNSEL: When you get money from Horizon Health, who transfers the money into that account?

NATHANIEL: It's transferred from Horizon to my Bank of America account and it's probably my granddaughter Courtney Stanich.

DEFENSE COUNSEL: So Courtney testified previously that she handles a lot of the bills at Horizon. So is she the one responsible then for putting the money in?

NATHANIEL:  Yes.

DEFENSE COUNSEL:  Are you — do you authorize her to do that or who does?

NATHANIEL:  I do.

Nathaniel stated he would not have been surprised to learn that between March 2021 and February 2023, approximately $900,000 was deposited into the BOA account.

{¶ 74} The BOA account records reflect banking activity from March 2021 through February 2023, and show deposits into Nathaniel's BOA account from PayPal accounts, online banking transfers, and "HORIZON HEALTH S. DES:CORP PAY".  The "HORIZON HEALTH S. DES:CORP PAY" deposits ("Horizon corporate pay") were deposited on these dates and in these amounts:  November 9, 2021 — $93,450, November 9, 2021 — $56,700, December 2, 2021 — $13,650, January 3, 2022 —$13,650, February 1, 2022 — $13,650, March 2, 2022 — $13,650, April 1, 2022 — $13,650, May 3, 2022 — $13,650, June 1, 2022 — $13,650, July 1, 2022 — $13,650, August 1, 2022 — $13,650, August 12, 2022 — $50,000, September 1, 2022 — $13,650, September 30, 2022 — $13,650, October 19, 2022 — $21,500, November 1, 2022 — $13,650, November 8, 2022 — $10,000, December 1, 2022 — $18,650, December 2, 2022 — $12,525, December 30, 2022 — $18,650, January 3, 2023 — $12,525, January 31, 2023 — $18,650, and February 3, 2023 — $12,525.

{¶ 75} Nathaniel was questioned specifically about the Horizon deposits dated August 1, 2022, and August 12, 2022; he stated they were "obviously [his]

pay." Nathaniel testified that the deposits designated as payroll as well as the general online transfers represented his Horizon income.

{¶ 76} In contrast to Nathaniel's testimony about receiving income from Horizon, Courtney, who is employed in the company's accounting department, stated that Nathaniel did not earn income from Horizon:

> DEFENSE COUNSEL:  Isn't your grandfather on the payroll?
>
> COURTNEY:  No.
>
> DEFENSE COUNSEL:  Well, where does he get the money, get the money to give your mother?  Her allowance, I think that's what your sister said.  She gets an allowance every month?
>
> COURTNEY:  I don't know.
>
> DEFENSE COUNSEL:  No.  So your grandfather doesn't get a payroll check?
>
> COURTNEY:  No.

Courtney also testified that Michelle does not work for Horizon and Michelle has no assets or money of her own:

> DEFENSE COUNSEL:  [$]50,000.  So, let me see if I get this right, you're 27-years old.  You make a couple hundred thousand dollars a year.
>
> You have [$]50,000 — [$]60,000 in your bank accounts, and your mother over here is destitute.  That's what you're telling me?
>
> COURTNEY:  Yep.
>
> DEFENSE COUNSEL: Yep?  Right?  And she owns nothing?
>
> COURTNEY:  Correct.

{¶ 77} Nathaniel provided testimony that Michelle initially sheltered ownership interests in family businesses through her mother and former husband,

which supports Holden's allegations that Michelle uses her family members to hide her ownership of Horizon:

> DEFENSE COUNSEL: Let me make sure I understand in reference to all of this. Basically your daughter she shelters ownership interest in corporations first through her mother, and one of her four husbands to begin with, correct?
>
> NATHANIEL: Yes.

{¶ 78} Michelle denied she prepared PPP loan applications on behalf of the family companies. When questioned on this topic, Nathaniel could not recall who he authorized to apply for Horizon's PPP loans, but he denied it was Michelle. We note that Nathaniel stated he had some difficulty understanding defense counsel's questions:

> DEFENSE COUNSEL: No. What individual did you give authorization to apply?
>
> NATHANIEL: I don't remember.
>
> DEFENSE COUNSEL: Well you gave it to your daughter, she applied in your name, correct?
>
> NATHANIEL: No.
>
> DEFENSE COUNSEL: No. She never filled out the form. Signed the forms and submitted it, right?
>
> NATHANIEL: No.
>
> DEFENSE COUNSEL: Okay. If the evidence is otherwise that she actually did it, you just don't know about it, correct?
>
> NATHANIEL: Possibly.
>
> DEFENSE COUNSEL: Well sir, you do know we have her signature as applying for it, correct?
>
> NATHANIEL: Yes.

DEFENSE COUNSEL: Okay. So then why would you tell me you didn't know who applied for it?

NATHANIEL: Some of the questions you asked me I cannot perfectly understand what you're asking because it's garbled.

{¶ 79} Despite Nathaniel's testimony, the record demonstrates Michelle completed PPP loan applications for the family companies in 2020, and the companies received the loans. PPP loans were also disbursed in 2021 for these companies, but the record does not demonstrate who completed those 2021 applications. Michelle's completion of the PPP loan applications for the family companies demonstrated she held herself out as a representative of the companies. Michelle also completed PPP loan applications on behalf of Snap Medics in 2020 and 2021.

{¶ 80} To further demonstrate Michelle earned income during their marriage, Holden introduced a purchase agreement Michelle executed on June 3, 2020, representing the purchase of the BMW. In the BMW purchase agreement, Michelle stated she was employed by Snap Medics with an income of $375,000. Michelle testified the BMW purchase agreement reflected her income at that time. In contrast, Michelle's financial disclosure form, her trial testimony, and Snap Medics records indicate her 2020 Snap Medics income was only $53,000.

{¶ 81} All the above-described evidence, when looked at collectively, supports the trial court's conclusion that Michelle committed financial misconduct.

### b. Snap Medics

{¶ 82} The trial court concluded that Snap Medics, a company owned by Michelle and Holden, was an illegitimate business that fraudulently obtained PPP Loans:

> During the four (4) day trial there was no evidence that Snap Medics was a legitimate business enterprise. PPP loans were intended to help small businesses during a global pandemic to keep their lights on and their workforce employed. However, the evidence demonstrated that this entity only operated as a vehicle for [Michelle's] own enrichment. She obtained PPP loans in the name of this sham business to cover salaries for her ghost employees. [Michelle] testified that the Federal Government subsequently forgave these PPP loans, based on her fraudulent claims and sworn declaration converting her government windfall from a debt to an asset in the amount of $501,260.00. In most cases this $501,260.00 would be a marital asset subject to division by the Court. However, the Court cannot in good conscience allocate what appears to be fraudulently obtained funds from the Federal Government for a business that did not exist.

Dec. 27, 2023 judgment entry, p. 17.

{¶ 83} Neither party argued that Snap Medics was an illegitimate business nor does the record support this conclusion. Conversely, the record demonstrates on March 17, 2020, Michelle and Holden, with respective 85 percent and 15 percent ownership interests, formed Snap Medics LLC. The record includes Snap Medics' bank statements that reflect the payment of payroll from May 2020 through March 2021 and the company's 2020 and 2021 federal tax returns, indicating the company was a valid, operating business. The trial court abused its discretion when it found Snap Medics was an illegitimate business.

{¶ 84} Notwithstanding Michelle's testimony that Snap Medics ceased business in November 2020 or February 2021, documentary evidence presented at

trial demonstrated that the company continued operations through at least September 2021. Michelle applied for and received PPP loans on the company's behalf in May 2021.[6] Additionally, the bank records of Ian, Nicole, and Courtney demonstrate that from January 2021 through September 2021, Snap Medics made payroll deposits into Ian and Nicole's shared bank account and into Nicole and Courtney's shared bank account.

{¶ 85} "There must be a clear showing that the offending spouse either profited from the alleged misconduct or intentionally defeated the other spouse's distribution of assets." *Eggeman v. Eggeman*, 2004-Ohio-6050, ¶ 24 (3d Dist.), citing *Wideman v. Wideman*, 2003-Ohio-1858, ¶ 34 (6th Dist.), and *Detlef v. Detlef*, 2001 Ohio App. LEXIS 5597 (6th Dist. Dec. 14, 2001). The continued operation of Snap Medics and Michelle's misleading of the court on this issue was dishonest but it did not constitute financial misconduct.

{¶ 86} While the record did not support the trial court's finding that Snap Medics was a "sham business," in light of Michelle's overall financial misconduct, the trial court did not abuse its discretion in awarding a greater portion of the marital property to Holden.

{¶ 87} Thus, Michelle's first assignment of error is overruled.

---

[6] Michelle previously applied for and Snap Medics received PPP loans in May 2020. Snap Medics received a total of $501,260 pursuant to the 2020 and 2021 PPP loans.

## 2. Sale of Personal Residence

{¶ 88} In her second assignment of error, Michelle argues the trial court erred when it ordered the sale of the Lee Road residence and awarded all sale proceeds, after paying off the mortgage and HELOC, to Holden rather than to Michelle. Michelle further argues that the court erred when it ordered the sale of the residence without considering Michelle's purchase of the property. "Trial courts have broad discretion in deciding appropriate property awards in divorce cases." *Bostick v. Bostick*, 2008-Ohio-5119, ¶ 19 (8th Dist.), citing *Berish v. Berish*, 69 Ohio St.2d 318, 319 (1982). "An appellate court yields broadly to a trial court's division of marital property." *Glover v. Glover*, 2009-Ohio-5742, ¶ 10 (2d Dist.).

### a. Immediate sale of real property

{¶ 89} Initially, Michelle cites to this court's decision in *Oatey v. Oatey*, 83 Ohio App.3d 251 (8th Dist. 1992), in support of her argument that the trial court ordered a wholesale sacrifice sale of the Lee Road residence.

{¶ 90} In *Oatey*, the trial court ordered the immediate sale of several condominiums prior to final disposition, with half of the sale proceeds allocated to satisfy attorney's fees and the remaining half of the proceeds to be placed in escrow for possible future attorney's fees and litigation expenses. The *Oatey* Court found the order to liquidate numerous condominiums within 60 days was an "immediate wholesale sacrifice sale of real property" that was "not commercially reasonable and may irrevocably deprive both parties from realizing the fair market value of the assets to their detriment." *Oatey* at 261. Such a sale, without concern for market

conditions, constituted an abuse of discretion. We do not find the *Oatey* facts comparable to those before us.

{¶ 91} Here, as part of the final disposition of the divorce proceedings, the trial court ordered the immediate sale of the Lee Road residence, one of two homes titled to Holden. Michelle and Holden both had alternate residences where they could reside. Although Michelle argues the court gave no consideration to market conditions when ordering the immediate sale of the home, we find the fact that the Lee Road residence was encumbered by a mortgage and HELOC and subject to foreclosure proceedings supported the order to immediately sell the property.

### b. Purchase of Lee Road residence by Michelle

{¶ 92} Michelle also contends that she wanted to purchase Holden's interest in the Lee Road residence and the trial court erred when it refused to award her the property for which her father, Nathaniel, had paid all the equity. Michelle first proposed this option, after trial, when she filed her objections to the magistrate's July 27, 2023 decision.

{¶ 93} The trial court found Michelle's attempt to retain the Lee Road residence not feasible since she repeatedly testified she lacked income and assets and, therefore, it was unclear how she could finance the purchase of the Lee Road residence. We acknowledge that the trial court's claim that Michelle lacked any income or resources to purchase the Lee Road residence was arguably contradictory to the court's finding that Michelle concealed income from Holden and, as a result, awarded Holden a greater share of the marital property.

{¶ 94} Nonetheless, we find the record supports the trial court ordering the immediate sale of the Lee Road residence in the December 27, 2023 divorce decree. Holden was the titled owner to the Lee Road residence. Michelle, Nicole, and Nicole's family resided at both the Lee Road and Gates Mills residences, and they could live exclusively at the Gates Mills residence. Holden resided at the South Woodland Road residence with his girlfriend — with whom he fathered a child — and her children.

{¶ 95} The Lee Road and South Woodland residences are situated next to one another, with a connecting hallway and yards, and the ability for the residents of one property to observe the occupants of the other property. Michelle testified:

> The homes actually attach. They're — they're on the corner. And the South Woodland house faces South Woodland. The Lee Road house faces Lee Road. There's a connecting hallway and the yards connect.

During the divorce proceedings, Michelle entered Holden's home, without consent, and removed the Audi from his garage. Based upon the properties' close proximity to one another and the contentious nature of the parties' relationship, ownership of the Lee Road and South Woodland residences by each party would neither be recommended nor equitable for the parties. Further, we note that if Michelle owned real estate, it may be subject to the restitution order stemming from her 2005 felony conviction in federal court. Finally, Michelle's claims that Nathaniel was entitled to the property are meritless since Nathaniel is not a party to this appeal

{¶ 96} Under these circumstances, the trial court's decision to order the immediate sale of the Lee Road residence was not an abuse of discretion.

### c. R.C. 3105.171 Factors

{¶ 97} Lastly, Michelle argues the trial court abused its discretion when it failed to consider the R.C. 3105.171(F) factors prior to its inequitable division of the Lee Road residence.

{¶ 98} A trial court determines what constitutes marital property and divides that property pursuant to R.C. 3105.171:

> "R.C. 3105.171 provides the statutory framework for division of marital property. The statute directs the court to divide marital property equally, unless an equal division would be inequitable. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court is required to consider the factors set forth in R.C. 3105.171(F).

*Dietrich v. Dietrich*, 2008-Ohio-5740, ¶ 27 (8th Dist.), quoting *Terry v. Terry*, 99 Ohio App.3d 228 (8th Dist. 1994). The trial court need not recite each factor in its judgment entry but the court must consider each R.C. 3105.171(F) factor when dividing marital property. *Cangemi v. Cangemi*, 2006-Ohio-2879, ¶ 67 (8th Dist.). A trial court's failure to consider the R.C. 3105.171(F) factors constitutes an abuse of discretion. *Heslep v. Heslep*, 2000 Ohio App. LEXIS 2777, *7 (7th Dist. June 14, 2000), citing *Bisker v. Bisker*, 69 Ohio St. 3d 608, 609 (1994).

{¶ 99} Michelle argues the trial court failed to consider these R.C. 3105.171(F) factors:

> (5) The economic desirability of retaining intact an asset or an interest in an asset;
>
> (6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property;[.]

{¶ 100} A review of the record demonstrates that, as discussed, the trial court considered these factors when it assessed the sale of the Lee Road residence and divided the property. The trial court acknowledged the Lee Road property was in foreclosure, and heard extensive testimony about Michelle's financial misconduct and about the parties' finances, including the fact that Michelle did not file tax returns during her marriage. Under these circumstances, we find the trial court adequately considered the R.C. 3105.171(F) factors.

{¶ 101} For the foregoing reasons, we find the trial court did not err when it ordered the sale of the Lee Road residence and awarded any excess sale proceeds to Holden without providing Michelle an opportunity to purchase the property. Thus, we overrule Michelle's second assignment of error.

### 3. Attorney's fees

{¶ 102} In her third assignment of error, Michelle argues the trial court erred when it ordered her to pay Holden's attorney's fees. Generally, a litigant is responsible for his or her own attorney's fees. *Mason v. Mason*, 2002-Ohio-6042, ¶ 83 (8th Dist.), citing *Farley v. Farley*, 97 Ohio App.3d 351, 358 (8th Dist. 1994). In a divorce action, the trial court may determine on a case-by-case basis whether an award of attorney's fees is equitable. *Ockunzzi v. Ockunzzi*, 2006-Ohio-5741, ¶ 70 (8th Dist.), citing *Packard v. Mayer-Packard*, 2005-Ohio-4392, ¶ 8 (8th Dist.).

> In an action for divorce . . . a court may award all or part of reasonable attorney's fees and litigation expenses . . . . In determining whether an award is equitable, the court may consider the parties' marital assets

and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

R.C. 3105.73(A). R.C. 3105.73 establishes the means and method to award attorney's fees and litigation expenses while Dom.Rel.Loc.R. 21 ("Loc.R. 21") provides the procedure to seek redress for attorney's fees.

{¶ 103} Loc.R. 21 states, in pertinent part:

(B) Evidence in support of motion. At the time of the final hearing on the motion or pleading that gives rise to the request for attorney fees, the attorney seeking such fees shall present:

(1) An itemized statement describing the services rendered, the time for such services, and the requested hourly rate for in-court time and out-of-court time;

(2) Testimony as to whether the case was complicated by any or all of the following:

(a) new or unique issues of law;

(b) difficulty in ascertaining or valuing the parties' assets;

(c) problems with completing discovery;

(d) any other factor necessitating extra time being spent on the case;

(3) Testimony regarding the attorney's years in practice and experience in domestic relations cases; and

(4) Evidence of the parties' respective income and expenses, if not otherwise disclosed during the hearing.

. . .

(D) Failure to comply with the provisions of this rule shall result in the denial of a request for attorney fees, unless jurisdiction to determine the issue of fees is expressly reserved in any order resulting from the hearing.

Loc.R. 21.

**{¶ 104}** We review a trial court's decision to grant attorney's fees under an abuse-of-discretion standard. *Kapadia*, 2013-Ohio-5588, at ¶ 13 (8th Dist.), citing *Dureiko v. Dureiko*, 2010-Ohio-5599, ¶ 26 (8th Dist.). Here, we are asked to determine if the trial court abused its discretion when it awarded $192,960.22 in attorney's fees to Holden.

**{¶ 105}** During trial on March 2, 2023, defense counsel testified on direct and cross-examination about exhibit PPP. Exhibit PPP, which was offered and admitted into evidence, identifies Holden's attorney's fees and expenses totaling $118,406.40 for services rendered between October 13, 2020, and December 12, 2022. The exhibit provides the date of the service, a brief summary of the service, and the hours billed. The exhibit has redactions that (1) limit some of the descriptions of the services rendered and (2) appear to exclude information identifying the member of the firm who rendered the services except for three line items that indicate services were rendered by Mr. Joseph G. Stafford. During the March 2, 2023 hearing, defense counsel indicated he would provide a supplemental-billing statement.

**{¶ 106}** On March 7, 2023, Holden filed a notice stating he served counsel for Michelle and the third-party defendants with a supplemental attorney's fee bill. The supplemental bill was not filed with the court nor is it part of the record. No written objections were filed in response to the supplemental bill.

**{¶ 107}** On June 20, 2023, Holden submitted his proposed findings of fact and conclusions of law and requested for the first time an award of attorney's fees in

the amount of $192,960.22 — an increase of $74,553.82 from the fees requested at trial and presented in exhibit PPP. In the proposed findings of fact and conclusions of law, Holden referenced exhibits PPP and PPP(1) in support of his claim for attorney's fees and litigation expenses in the amount of $192,960.22. A thorough review of the trial transcript reveals that only exhibit PPP was presented at trial. Exhibit PPP(1) was not the subject of cross-examination by Michelle's counsel and was neither offered nor admitted into evidence at trial. In fact, exhibit PPP(1) was never made a part of the record.[7]

{¶ 108} On July 27, 2023, the magistrate issued a decision in which he made findings of fact and conclusions of law pursuant to the testimony and evidence submitted at trial. The magistrate's judgment entry erroneously stated that exhibit PPP(1) was admitted into evidence, and the court awarded Holden attorney's fees in the amount of $192,960.22:

> The Court finds that Plaintiff has engaged in economic misconduct by failing to disclose assets and income and frustrating discovery in this case. Further, Plaintiff has knowingly and purposefully failed to abide by court orders requiring Defendant to expend significant time and incur substantial attorney's fees in prosecuting Plaintiff[']s misconduct. Based upon the evidence submitted to this Court, an award of attorney's fees to Defendant in the amount of $192,960.22 is reasonable and equitable in this matter.

July 27, 2023 magistrate's decision, p. 18.[8]

---

[7] Holden references exhibit PPP(A), a summary of hourly rates, in his appellee's brief, but no such document was made part of the record and, therefore, is not considered on appeal. *See* appellee's brief, p. 32.

[8] The trial court's December 27, 2023 divorce judgment entry adopted the magistrate's July 27, 2023 decision regarding the award of attorney's fees.

{¶ 109} On August 10, 2023, Michelle filed objections to the magistrate's decision on several issues including the award of Holden's attorney's fees. Michelle argued exhibit PPP did not satisfy Loc.R. 21(B) because the attorney's fees statement did not identify which attorneys rendered the listed services and at what rate and because the statement did not identify any payments submitted by Holden. Michelle argued that the trial court's award of attorney's fees was unsupported by the record because exhibit PPP, which was presented at trial, reflected attorney's fees and expenses in the amount of $118,406.40, not $192,960.22. Michelle also argued Holden's failure to file a financial disclosure affidavit, his delay in conducting discovery, and other acts that left him with unclean hands, along with Michelle's lack of income and minimal assets, did not support an award of attorney's fees in Holden's favor. The trial court overruled Michelle's objections to the magistrate's decision, adopted the magistrate's decision regarding attorney's fees without modification, and ordered Michelle to "pay to [Holden] . . . the sum of $192,960.22, as and for attorney fees."

{¶ 110} On appeal, Michelle contends (1) the magistrate's July 27, 2023 decision erroneously admitted defendant's exhibit PPP(1) into evidence, (2) Holden's itemized fee statement (exhibit PPP) fails to conform with Loc.R. 21(B), and (3) Michelle's conduct did not support an award of attorney's fees.

### a. Conduct Supporting an Award of Attorney's Fees

{¶ 111} Initially, we find the trial court was justified in awarding attorney's fees to Holden. The trial court awarded Holden attorney's fees due to Michelle's

financial misconduct, failure to follow court orders, and acts that frustrated the discovery process. The record demonstrates there was sufficient evidence to support this award. Michelle committed financial misconduct when she hid the income she received from Horizon. Michelle took Holden's 2016 Audi from his garage, without consent, drove it out of state, and then failed to return the vehicle — despite court orders to do so — for over a year. Michelle's actions resulted in numerous filings by Holden to recover his property that the trial court characterized as "frustrating the discovery process."

{¶ 112} The trial court was under no obligation to examine the parties' behavior and determine whether Holden also exhibited acrimonious or inappropriate behavior. *Kim v. Kim*, 2020-Ohio-22, ¶ 48 (9th Dist.). The trial court needed only to find the award of reasonable attorney's fees was equitable. *Id*. Michelle's conduct supported an award of attorney's fees.

### b. Exhibit PPP(1)

{¶ 113} Next, we address exhibit PPP(1). On March 28, 2023, the last day of trial, the magistrate admitted into evidence exhibit PPP, not exhibit PPP(1). The magistrate's decision after trial incorrectly indicated that exhibit PPP(1) had been admitted at trial. The magistrate apparently relied on exhibit PPP(1) when he granted Holden attorney's fees in the amount of $192,960.22. The court adopted the magistrate's July 27, 2023 decision that erroneously found exhibit PPP(1) was admitted into evidence. Michelle's August 10, 2023 objections to the magistrate's decision addressed the issue of attorney's fees but did not argue that the court

erroneously admitted exhibit PPP(1). Therefore, that argument is waived except for plain error.

{¶ 114} Civ.R. 53(D)(3)(b)(iv) provides, "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless that party had objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." "Thus, when a party fails to properly object to a magistrate's decision in accordance with Civ.R. 53(D)(3)(b), it generally forfeits the right to assign those issues as errors on appeal." *Marrs v. Mickel*, 2023-Ohio-4528, ¶ 12 (8th Dist.), citing *U.S. Bank, N.A. v. Matthews*, 2017-Ohio-4075, ¶ 14 (8th Dist.).

{¶ 115} Generally, in rendering a decision, a trial court may only consider evidence admitted at trial. *Hoaglin Holdings v. Goliath Mtge., Inc.*, 2004-Ohio-3473, ¶ 15 (8th Dist.); *see also Buttner v. Renz,* 2014-Ohio-4939, ¶ 14 (8th Dist.) ("Because there was no testimony regarding damage[s] and the exhibits were not admitted into evidence, the trial court's damage award is not supported by competent, credible evidence."). Further, "[t]he record on appeal consists of the original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court." *P.D. Harris v. P. Harris*, 1982 Ohio App. LEXIS 13529, *2 (8th Dist. June 17, 1982).

{¶ 116} A review of the trial transcript demonstrates exhibit PPP(1) was never introduced at trial and was never made a part of the record, though Holden

argued in his proposed findings of fact and conclusions of law that exhibit PPP(1) supported an award of $192,960.22. While exhibit PPP was admitted at trial and testimony was elicited regarding that exhibit, nothing in the record demonstrated that Holden incurred attorney's fees in the amount of $192,960, much less that fees in that amount were reasonable. Thus, we find it was plain error for the trial court to adopt the magistrate's finding that exhibit PPP(1) had been admitted into evidence and it was an abuse of the trial court's discretion to award attorney's fees in the amount of $192,960,22.

{¶ 117} We sustain in part and overrule in part Michelle's third assignment of error. We overrule the portion of Michelle's third assignment of error that argues Michelle's conduct did not support an award of attorney's fees. We sustain Michelle's third assignment of error as it relates to exhibit PPP(1) and remand this matter for the trial court to issue a journal entry to correctly reflect what occurred at trial, specifically that exhibit PPP(1) was not admitted at trial. We find the attorney's fees award in the amount of $192,960.22 was an abuse of discretion. We vacate the trial court's award of $192,960.22 in attorney's fees to Holden and remand the case for the trial court to determine, pursuant to R.C. 3105.73(A) and the evidence in the record at trial, an award of reasonable attorney's fees and expenses that the court finds equitable.[9]

---

[9] Our decision remanding the matter to the trial court to determine reasonable fees and an equitable award based on the evidence in the record renders Michelle's Loc.R. 21 argument moot for purposes of this appeal.

**B. Holden's Cross-Appeal**

**1. Time Restrictions**

{¶ 118} In Holden's first cross-assignment of error, he argues that the trial court erred as a matter of law, abused its discretion, and violated his due process rights when it imposed arbitrary time restrictions on the presentation of trial evidence. Specifically, the trial court limited direct examination of each trial witness to 60 minutes and cross-examination of each witness to 45 minutes.

{¶ 119} The scope of witness examination is governed by Evid.R. 611 that states a "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 611(A). Cross-examination "shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B).

{¶ 120} Initially, we note that the record does not support Holden's arguments that Michelle and the third-party defendants exploited the court's time limitations through the use of excessive and improper objections and interruptions or that the time limitations served only to benefit Michelle throughout the proceedings.

{¶ 121} This court recently addressed the same time limitations that were imposed here and found no abuse of discretion absent a showing of (1) the evidence the party was prohibited from presenting due to the limitation and (2) how the party

was prejudiced. *Machen v. Miller*, 2024-Ohio-1270, ¶ 58 (8th Dist.); *M.F.S. v. B.T.S.*, 2024-Ohio-4680, ¶ 37-44 (8th Dist.).

{¶ 122} The cross-examination of Michelle was discontinued because counsel was beyond the prescribed time limit:

> THE MAGISTRATE: Here. We're out of time. You're over time, actually.
>
> DEFENSE COUNSEL: That's Your Honor. I can't even get to tax records or anything else.
>
> THE MAGISTRATE: I understand your position but you're out of time.
>
> . . .
>
> DEFENSE COUNSEL: I note a strenuous objection. I'm not even close to being done with the cross-examination of a witness concerning 15 or 20 million in assets that somehow we can't even get a car returned.

{¶ 123} Defense counsel presented a proffer at trial wherein he argued that the court's time limitations precluded him from adequately questioning Michelle about (1) $4.6 million dollars she fraudulently obtained through PPP loans, (2) eight real estate holdings, (3) nine business interests, and (4) nine vehicles. Holden claimed that because of the time constraints he could not establish the criminal enterprise run by Michelle or demonstrate the disputed assets constituted marital property.

{¶ 124} Pursuant to our finding that Michelle hid income from Holden through her use of Nathaniel's BOA account, Holden successfully established Michelle's improper engagement with the family businesses.

{¶ 125} Regarding the PPP loans, real estate holdings, business interests, and vehicles, Holden argued that the disputed assets constituted marital property. Marital property is defined by statute as:

> (i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

> (ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

> (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage

R.C. 3105.171(A)(3)(a)(i)-(iii). To establish the disputed assets were marital property, Holden needed to provide testimonial evidence and/or documentation that the assets in question were acquired during the marriage and were titled to Holden, to Michelle, or to Holden and Michelle.

{¶ 126} Defense counsel's proffer did not demonstrate what evidence he was prohibited from presenting and, thus, did not make the requisite showing to establish the time limits were an abuse of discretion. The proffer statement merely indicated that Holden was unable to demonstrate the disputed assets constituted marital property.

{¶ 127} We are sympathetic to the difficulties that flow from severe time restrictions, but under the circumstances here we do not find that the time

constraints were an abuse of discretion. Thus, we overrule Holden's first cross-assignment of error.

## 2. Division of Marital Property

{¶ 128} In Holden's second cross-assignment of error, he argues that the trial court erred as a matter of law and abused its discretion in its identification and division of marital property and its failure to award Holden a distributive award. Specifically, Holden argues that additional real estate, vehicles, and business interests identified in exhibit JJJ should have been categorized as marital property, and he was entitled to a distributive award in addition to a greater portion of the marital property.

{¶ 129} After a trial court classifies property as either marital or separate, a review of that determination is limited to whether the classification was supported by the manifest weight of the evidence. *Allan v. Allan*, 2019-Ohio-2111, ¶ 65 (8th Dist.), citing *Marcum v. Marcum*, 116 Ohio App.3d 606, 612, (2d Dist. 1996).

{¶ 130} The Ohio Supreme Court explained the manifest-weight standard in a civil case:

> Weight of the evidence concerns "'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* (6th Ed.1990). When

conducting a manifest-weight review, this court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley* at ¶ 20, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### a. Real Estate Holdings

{¶ 131} Holden contends that the following properties should have been allocated as marital property and divided by the court: the Gates Mills residence, the Lakeshore residence, the Highland Road property in Richmond Heights, the Coventry Road residence in Cleveland Heights, the Eastwood Avenue property in Akron, and the Cedar Road property in Cleveland Heights, Ohio ("the disputed properties").

{¶ 132}   The record demonstrates none of the properties in question were titled to Michelle or Holden.  The Gates Mills residence is titled to Jonathan Kerkian, trustee of the Brigham Property Trust.  The Lakeshore residence is titled to Nicole.  The Highland Road property is titled to Nicole as Trustee of the Century Show Place Trust.  The Coventry residence is titled to Ian, and the Eastwood Avenue property is titled to 2165 Eastwood Avenue L.L.C.  Where no evidence was introduced to establish either Michelle or Holden held title or interest in the disputed properties, the trial court's decision not to allocate them as marital property was supported by the record and was not against the manifest weight of the evidence.

### b. Vehicles

{¶ 133} Holden listed nine vehicles in exhibit JJJ and argues the trial court erred when it allocated only four of those vehicles as marital assets.

{¶ 134} Holden argues the trial court did not acknowledge Michelle's interest in the Mercedes Benz G-Wagon that Michelle attempted to conceal by placing title in her daughter's name. Nicole testified that she purchased the Mercedes Benz G-Wagon, which is titled in her name, and she makes the monthly payments. Nicole also testified that both she and Michelle drive the vehicle. Absent evidence that Michelle acquired the Mercedes Benz G-Wagon during the marriage, the trial court's decision not to consider the vehicle as marital property was supported by the record and was not against the manifest weight of the evidence.

{¶ 135} Based on the foregoing, the trial court's decision not to classify the remaining vehicles as marital property was not against the weight of the evidence.

### c. Business Interests

{¶ 136} Holden contends Michelle held an ownership interest in Snap Medics and a portion of that interest, along with the PPP loans received for that company, should have been allocated as marital property. The record shows Snap Medics ceased operations in September 2021. We see no basis to allocate a business that no longer exists, and we find the PPP loans received by Snap Medics were intended to satisfy payroll and were not classified as marital property.

{¶ 137} Holden further contends Michelle, as a managing member of 13001 Church L.L.C., had ownership interests in the business. Holden offers no case law

to support this claim but relies on a December 9, 2020 letter that identifies Michelle as a managing member.  *See* exhibit UU.  Michelle testified that she is a managing member of 13001 Church L.L.C., but denied she is an owner.  In accordance with corporate law, "a membership interest in an LLC does not confer on its members an interest in the company's property."  *In re Salyer*, 2021 Bankr. LEXIS 1606, *11 (N.D. Ohio June 15, 2021); *see Kiddie Co. Enrichment Ctr. v. Cuyahoga Cty. Bd. of Revision*, 2012-Ohio-5717, ¶ 14 (8th Dist.), citing *Parma City School Dist. v. Cuyahoga Cty. Bd. of Revision*, BTA No. 2003-T-1035, 2004 WL 1698440, *3 (July 23, 2004) (concluding, after analysis of statutes and case law, that "Mr. Rzepka's membership interest in an Ohio limited liability company provides no ownership interest in [the company's property that was the subject of the appeal]").  We find Michelle's classification as the managing member was insufficient to establish interest rights in company property.

{¶ 138}  Holden argues exhibit TT(2) — the lease agreement naming Holden as the landlord and Horizon as the tenant of the Cedar Road property — demonstrates his or Michelle's ownership interests in 13001 Church L.L.C.  We find the lease agreement provides no evidence of ownership or interest rights.

{¶ 139}  Holden also argues Michelle possessed an ownership interest in the family companies and, therefore, the businesses — as well as the PPP loans received by the companies — constituted marital property.  Holden argues that Michelle operated the businesses while her family members held the companies in name only.  Holden contends that Michelle used funds from Horizon to pay her bills, and

Michelle's completion of the PPP loan applications, demonstrated her ownership interests in the entities. Michelle, Nathaniel, Nicole, Courtney, and Ian all denied Holden's allegations.

{¶ 140} The record shows none of the family companies are titled to Michelle. No evidence was introduced demonstrating Michelle has ownership interests in the businesses or the companies' PPP loans. The trial court's determination not to classify the family businesses or their PPP loan money as marital property was supported by the record and was not against the manifest weight of the evidence.

{¶ 141} Lastly, Holden argues the trial court should have allocated Visionary Group, L.L.C. ("Visionary") as his separate, nonmarital property. Holden testified that he is the owner of Visionary and presented the court with an Ohio Secretary of State report that shows the L.L.C.'s articles of organization were filed on April 1, 2013, with Holden becoming the statutory agent on August 9, 2013. Michelle's financial-disclosure statement lists Visionary as a business titled to Holden with an unknown value; Holden did not file a financial-disclosure form. No bank statement, tax return, or other business document was introduced for Visionary although Holden sought such records from the third-party defendants.

{¶ 142} When Holden objected to the magistrate's failure to designate Visionary as his separate property, the trial court stated:

> Defendant states in his objections that he is the owner of Visionary Group, LLC and that the Magistrate erred in not allocating the business. The only evidence presented regarding this business is a

Secretary of State Business Registration and a line on a Personal Financial Statement, signed by Plaintiff, during the marriage. Plaintiff testified at Trial that she signed the Personal Financial Statement but had no knowledge of its contents. There was no testimony or evidence produced that the business continues to be operable or contains any assets. The Court cannot allocate a business that no longer exists. Defendant's second objection is sustained in part and overruled in part.

December 27, 2023 judgment entry, p. 24.

{¶ 143} While Holden argues Visionary was his business, he failed to present the court with a financial-disclosure form or produce any testimony or evidence as to the ongoing nature of the business and its assets. Based upon the evidence introduced at trial, the trial court's decision not to allocate the business was not against the manifest weight of the evidence and the trial court did not abuse its discretion.

### d. Distributive Award

{¶ 144} Holden contends that the trial court should have granted him both a greater division of marital property and a distributive award because he was not adequately compensated for Michelle's undisclosed assets and income.

{¶ 145} Under a plain reading of R.C. 3105.171(E)(4) and (5), if a spouse engaged in financial misconduct or substantially and willfully failed to disclose marital property or income, the trial court "may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(4) and (5). The statute permits either a distributive award or a greater award of marital property, not both, and the Eighth District Court of Appeals has followed this interpretation of the statute. *See T. A. v. R. A.*, 2019-Ohio-3179,

¶ 32 (8th Dist. ) ("Pursuant to R.C. 3105.171(E)(4), a trial court has two remedies to compensate a spouse for the other spouse's financial misconduct: (1) a distributive award, or (2) a greater award of marital property.").

{¶ 146} Holden relies on *Ebner v Ebner*, 2010-Ohio-459 (5th Dist.), where the award of both a distributive award and a greater award of marital property was found necessary because there was insufficient property to compensate appellee for appellant's misconduct. We decline to follow this case where there was sufficient property to adequately compensate Holden for Michelle's financial misconduct, *Ebner* has not been cited since its release, and *Ebner* has no precedential effect on this court.

{¶ 147} For the foregoing reasons, we overrule Holden's second cross-assignment of error.

### 3. Spousal Support

{¶ 148} In his third cross-assignment of error, Holden argues the trial court abused its discretion when it failed to award him spousal support.

{¶ 149} R.C. 3105.18 governs an award of spousal support in divorce proceedings. "The goal of spousal support is to reach an equitable result," and a trial court reaches this goal through consideration of the R.C. 3105.18(C) factors. *Hloska v. Hloska*, 2015-Ohio-2153, ¶ 11 (8th Dist.), citing *Kaechele*, 35 Ohio St.3d at 96. A trial court shall consider all 14 statutory factors when determining whether spousal support is appropriate and reasonable: (a) the parties' income from all sources, including income derived from the property division made by the court; (b) the

relative earning abilities of the parties; (c) the parties' ages and physical, mental, and emotional conditions; (d) the parties' retirement benefits; (e) the duration of the marriage; (f) minor children; (g) the standard of living during the marriage; (h) the parties' education; (i) the relative assets and liabilities of the parties; (j) the parties' contribution to education, training, or earning ability; (k) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience; (l) the parties' tax consequences for a spousal support award; (m) the parties' lost income production capacity that resulted from that party's marital responsibilities; and (n) any other factor that the court finds to be relevant and equitable. R.C. 3105.18(C). A trial court need not reference each statutory factor, but the record must demonstrate consideration of them. *Neumann v. Neumann*, 2012-Ohio-591, ¶ 17 (8th Dist.), citing *Carman v. Carman*, 109 Ohio App.3d 698, 703 (12th Dist. 1996).

{¶ 150} Here, based upon a review of the R.C. 3105.18(C) factors, the magistrate determined that a spousal support award was unreasonable and inappropriate, and the trial court adopted that recommendation when it stated:

> [Michelle] and [Holden] were married on September 15, 2015, and [Michelle] filed her Complaint for Divorce on February 18, 2020, less tha[n] five (5) years later. A review of the record shows that [Holden] attempted to obtain an award of temporary spousal support three (3) times during the pendency of this case; February 17, 2021, April 27, 2021, and February 16, 2022. All three Motions for Temporary Support were denied. As previously stated, [the magistrate] found that an award of spousal support was not reasonable in his July 27, 2023, Magistrate's Decision.

> This was a short-term marriage. [Holden] worked and earned substantial income during the marriage, while [Michelle] recorded no income. [Michelle] and [Holden] have no minor children. After considering all the factors in R.C. 3105.18 the Court finds that spousal support is not appropriate in this matter. [Holden]'s objection is overruled.

Dec. 27, 2023 judgment entry, p. 25.

{¶ 151} Pursuant to the R.C. 3105.18(C) factors, the record supports the finding that an award of spousal support was neither reasonable nor appropriate. We find that the trial court did not abuse its discretion when it considered the R.C. 3105.18(C) factors and determined not to award Holden spousal support. Thus, Holden's third cross-assignment of error is overruled.

{¶ 152} Judgment affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion. We overrule Michelle's first and second assignments of error as well as Holden's first, second, and third cross-assignments of error. We overrule the portion of Michelle's third assignment of error that argues Michelle's conduct did not support an award of attorney's fees. We sustain the portion of Michelle's third assignment of error that argues the trial court erroneously admitted exhibit PPP(1) into evidence. We sustain the portion of Michelle's third assignment of error that argues the attorney's fees award in the amount of $192,960.22 was an abuse of discretion, and we vacate the trial court's award of $192,960.22 in attorney's fees to Holden. We remand this matter for the trial court to issue a judgment entry correctly reflecting what occurred at trial, specifically that exhibit PPP(1) was not admitted into evidence at trial. Additionally,

on remand the trial court will determine, pursuant to R.C. 3105.73(A) and the evidence in the record, an award of reasonable attorney's fees that the court finds equitable and issue a corresponding judgment entry.

It is ordered that the appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MICHELLE J. SHEEHAN, P.J., and
MICHAEL JOHN RYAN, J., CONCUR