[Cite as *Parsai v. Parsai*, 2025-Ohio-829.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

ESMAIL PARSAI,                      :

      Plaintiff-Appellant/      :
      Cross-Appellee,

                    :      Nos. 113550 and 113747

      v.                         :

PARVIN PARSAI,                      :

      Defendant-Appellee/       :
      Cross-Appellant.          :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 13, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-23-395292

---

### *Appearances:*

Stafford Law Co., L.P.A., and Nicole A. Cruz, *for appellant*.

Thurman and Associates, L.L.C., Adam J. Thurman, and Erik B. Quattro, *for appellee*.

DEENA R. CALABRESE, J.:

{¶ 1} Plaintiff-appellant/cross-appellee Esmail Parsai ("Esmail") and defendant-appellee/cross-appellant Parvin Parsai ("Parvin") appeal the decree of

divorce issued by the Cuyahoga County Common Pleas Court, Division of Domestic Relations. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} Esmail and Parvin met in Manhattan, Kansas, in 1980. They were introduced by relatives: Parvin was visiting a cousin who had just given birth to a daughter; Esmail was a friend of the cousin's husband. There is a dispute, however, regarding the date the parties were married. Parvin claims they were "Islamically married" in early 1981, "about February, March," when they exchanged vows and publicly announced their marriage to the community. There is no question that their marriage was legally regularized through civil marriage on September 8, 1989. Esmail urged the trial court to use the 1989 date for the inception of their marriage. The trial court agreed. As discussed more fully below in connection with Parvin's first assignment of error, the dispute is academic. The marriage endured until at least 2017, and fixing a marriage inception date of 1981 versus 1989 does not affect property division or spousal support.

{¶ 3} The parties have two children, a son and a daughter, both born after the date of civil marriage. They were emancipated adults by the time Parvin filed her original complaint in 2019. Both children are successful. Their son holds a juris doctor degree. Their daughter is a medical doctor.

{¶ 4} Esmail is highly educated and professionally successful. With Parvin's support, he obtained a Ph.D. many years ago and began work at the University of

Toledo, specializing in "[m]edical physics and radiation oncology." At trial, he briefly described the nature of his work:

> I'm board certified by the American Board of Radiology to treat cancer patients. Similar to my daughter, who is a radiation oncologist, but somebody like me will do the mathematical modeling and calculation for cancer patients as to how much dose they receive and how they receive it.

(Oct. 11, 2023 tr. 49.) Once Esmail began his career in earnest at the University of Toledo, he became the principal breadwinner. The trial court record includes testimony and exhibits documenting his substantial income immediately prior to and during the divorce proceedings, peaking at just over $492,000 in calendar year 2021.

{¶ 5} During the marriage, Parvin obtained a Ph.D. as well. Her doctorate is in education, and the couple had operated a daycare business known as Sylvania Children's Center. Parvin testified that she was principally responsible for its day-to-day operations, but that quarterly checks or "owner's draw[s]" were done in Esmail's name, and all income was reported under Esmail's name on the parties' tax returns. After Parvin left the marital home in 2017, she continued to supervise the daycare center's operations, sometimes remotely. In 2018, after the parties had split, Esmail sold the daycare center without Parvin's input or consent.

{¶ 6} There was some dispute over whether and when Esmail retired from the University of Toledo. Parvin alleged that while Esmail claimed to retire in January 2020, he was immediately reinstated with no reduction in pay. Esmail began drawing State Teachers Retirement Service ("STRS") benefits, however, in

2020. Both parties appear to agree that Esmail was retired by September 2022. He testified that this was when he stopped working. (Oct. 11, 2023 tr. 124.) The trial court referenced the same retirement date in its journal entry denying Esmail's motion for a new trial.

{¶ 7} Parvin testified that she drew no salary from Sylvania Children's Center or any other source. In short, she was wholly reliant on Esmail for support. Parvin testified there were no joint bank accounts that she could access. She did not open a bank account of her own until 2018, after the separation.

{¶ 8} The parties separated in May 2017, when Parvin left the home. The factors driving the separation were not explored in detail at trial, but Parvin testified that Esmail "told [her] to leave the house." Upon separating, Parvin visited Iran, her country of birth, for approximately three months. Esmail testified that "[w]hen she came back, she was not the same woman," and that he told her if she wanted to "change rules in the middle of the game," she could "go back to where [she] came from." He said Parvin "decided to create a hassle, broke me, and leave." Esmail and Parvin's adult children do not speak to their father.

{¶ 9} The record reflects that after the split, Esmail made efforts to reconcile. Parvin testified that Esmail visited Iran in July 2017, shortly after the separation: "He came there and he said that we can resume life." She returned to the United States, and Esmail called Parvin and, according to her testimony, "promised . . . that he would not have any of the lash-outs, that he would not be physically — he wouldn't beat me and he would not be using hurtful and verbally abusing me." As

discussed in more detail below, Esmail also sent hundreds of emails, which he estimated at some 800 printed pages, in an attempt to reconcile. The parties nevertheless did not reconcile, not even temporarily.

{¶ 10} While in the United States, Parvin has lived with the parties' daughter. While she testified that she relied on her daughter for financial support, the record indicates that Esmail has sent substantial payments to her following the separation, albeit not in compliance with the temporary support order entered on March 10, 2022. In fact, Esmail violated the trial court's mutual restraining order by selling the marital home in June 2021 without Parvin's consent. He sent Parvin $254,874.12, which he considered her portion of the sale proceeds.

{¶ 11} Parvin filed a complaint for divorce on August 27, 2019, in Cuyahoga D.R. No. DR-19-378176. She filed a motion for temporary support on August 29, 2019. The trial court did not rule on the motion until March 10, 2022. Following an exhaustive review of the parties' submissions, the trial court expressed skepticism that Esmail had actually retired in January 2020, noted his substantial continuing income even when STRS benefits were excluded, and ordered that he pay temporary support of $5,000 per month retroactive to January 1, 2020. The trial court credited Esmail with payments made to Parvin in the total amount of $45,000, but expressly rejected the notion that for purposes of the temporary support order, Esmail should be credited with the sum paid to Parvin following his unilateral sale of the marital home. The court remarked that this should be considered "property that is to be divided at final hearing." Taking into account the $45,000 paid to Parvin, the trial

court calculated an arrearage of $90,000. It ordered Esmail to pay $2,000 extra per month towards the arrearage.

{¶ 12} Esmail filed a Civ.R. 75(N)(2) motion for hearing the next day, March 11, 2022. The motion did not include any affidavits or other attachments, or any detailed discussion of the facts and applicable law, but merely argued "that the facts and circumstances do not justify the award enumerated in the Order of this Court." A hearing date was set and reset multiple times, but the trial court never held a hearing. Apart from a reference to the motion in Esmail's closing argument brief, the record does not reflect that the Civ.R. 75 motion was prosecuted further.

{¶ 13} The parties went to trial in DR-19-378176. After multiple days of trial spread over several months, the parties ultimately agreed to voluntarily dismiss DR-19-378176 on June 22, 2023. The case was refiled the same day as Cuyahoga D.R. No. DR-23-395292, this time with Esmail as plaintiff. The parties immediately submitted, and the trial court signed, an agreed judgment entry indicating:

> All . . . Orders, Temporary Orders, Temporary Restraining Orders, issues, claims for relief, motions, pleadings, Magistrate's Orders, Magistrate's Decisions, and Judgment Entries issued in Case No. DR-19-378176, are hereby carried forward into this matter and shall remain in full force and effect and shall remain as the orders of this Court, in this matter. Each party reserves their right to prosecute any motions, objections or claims currently pending before this Court in the newly filed action.

Parvin filed an answer and counterclaim, to which Esmail replied. On October 4, 2023, shortly before the scheduled trial date, Parvin filed a motion to accept the transcripts and exhibits from the earlier proceedings as evidence. Esmail opposed

the motion, arguing — despite the agreed judgment entry referenced above — that under controlling law, the 2019 action must be treated as if it had never been commenced, and the trial court "patently and unambiguously lacked jurisdiction" to accept the transcripts and exhibits from the earlier case.

{¶ 14} The trial court initially granted Parvin's motion, accepting the transcripts and exhibits "[i]n the interest of judicial efficiency." The morning of trial, however, on October 11, 2023, Esmail filed a motion to reconsider, raising the same arguments referenced above. That same afternoon, and without awaiting a response from Parvin, the court granted Esmail's motion to reconsider, thereby excluding the transcripts and exhibits from the 2019 case. In the same order, it ruled that the direct examination of witnesses "shall be limited to 60 minutes per witness" and cross-examination "shall be limited to 30 minutes per witness."

{¶ 15} The case ultimately proceeded to trial that afternoon, and it concluded the next day, October 12, 2023. Esmail and Parvin were the only witnesses. With respect to the core issue of division of marital property, the trial court heard testimony and admitted exhibits into evidence with respect to real estate holdings, as well as financial accounts, retirement accounts, life insurance and annuities, and personal vehicles. The parties also elicited testimony and presented exhibits to support their respective positions as to the duration of the marriage, specifically the proper inception and termination dates.

**{¶ 16}** At the conclusion of testimony, the trial court directed the parties to submit written closing arguments. Esmail and Parvin both submitted their closing argument briefs on October 25, 2023.

**{¶ 17}** The trial court issued its judgment entry of divorce on December 12, 2023. Prior to turning to division of property, the court analyzed the parties' arguments with respect to the duration of the marriage. The trial court rejected Parvin's argument that the marriage began, for purposes of these proceedings, in 1981. Citing Eighth District case law and remarking that the parties' children were not born until after the parties' legal marriage in 1989, the trial court selected the civil marriage date of September 8, 1989, as the marriage commencement date.

**{¶ 18}** With respect to the termination date of the marriage — i.e., whether to use a de facto termination date of May 1, 2017, as Esmail argued, or to use the final hearing date of October 11, 2023 — the trial court again analyzed the facts in light of applicable case law. It rejected Esmail's de facto termination date, principally citing the parties' continued filing of joint tax return, and further found that the separation "was the result of *unilateral* action by" Parvin rather than clear bilateral separation. (Emphasis added.) In addition, the trial court held that it did not believe "that it would be able to divide the marital property of the parties as of [May 1, 2017,] as no evidence was presented as to what property the Parties possessed at that time."

**{¶ 19}** The trial court next turned to property division. It found that both parties had an interest in four parcels of real estate. Finding insufficient evidence of valuation, the trial court ordered all property sold within six months, with the

proceeds to be divided evenly. As a sanction for transferring certain property during the pendency of the divorce proceedings and in violation of a mutual restraining order, the court ordered Esmail to pay all fees and costs associated with the listing and sale of the remaining properties.

{¶ 20} With respect to financial accounts and other assets other than real estate, the trial court first noted there was no testimony as to personal property or debt. With respect to automobiles, the court found that each party should keep the vehicle in their respective possession, noting that the only required title transfer (for Parvin's vehicle) had already been made.

{¶ 21} The court found it appropriate for Esmail to retain his account with University of Toledo Federal Credit Union and allowed Parvin to retain her account with JP Morgan Chase, which the court noted "appears to have solely been funded by property division payments made to [Parvin] by [Esmail]." The court found that Esmail's Signature Bank Account, "which is currently being held by Plaintiff's counsel," was to be divided equally between the parties.

{¶ 22} The trial court further ordered that Esmail liquidate his annuity and whole life policies with New York Life. The cash proceeds were to be divided equally.

{¶ 23} With respect to retirement accounts, the trial court held that Esmail had (1) a State Teachers Retirement Account ("STRS") pension; and (2) an Ohio Deferred Compensation account. The court ordered that the STRS account "be divided as spousal support to [Parvin]," but that the Ohio Deferred Compensation account be "divided equally between the parties."

{¶ 24} The trial court ordered that Esmail pay spousal support to Parvin in the amount of $1,500 per month for life, commencing December 1, 2023. The court retained jurisdiction to modify the order, and in accordance with R.C. 3105.18(B), ordered that payments would terminate if either party died or if Parvin cohabitated or remarried.

{¶ 25} Finally, the trial court addressed the March 10, 2022 temporary support order and arrearage. The trial court found that as of October 11, 2023, the arrearage was $190,000. It reduced that sum to judgment in favor of Parvin and against Esmail.

{¶ 26} The court ordered that the parties pay their own attorneys' fees and litigation expenses.[1] It further ordered that they split court costs equally.

{¶ 27} Esmail filed a motion for new trial on January 9, 2024. Parvin filed a motion for relief from judgment and/or clarification on January 10, 2024. Prior to any ruling on the two motions, both parties timely filed notices of appeal, Esmail on January 10, 2024, and Parvin on January 19, 2024.

{¶ 28} On January 17, 2024, Esmail filed a motion for limited remand to allow the trial court to consider Esmail's motion for a new trial and Parvin's motion for relief from judgment and/or clarification. On January 30, 2024, we granted the

---

[1] Immediately prior to this language, however, the trial court found "an award of attorney fees to be appropriate under R.C. 3105.73(A)." This inconsistency was addressed in the trial court's ultimate ruling on Parvin's subsequent motion for relief from judgment and/or clarification, discussed more fully below.

motion and ordered a limited remand for the trial court to consider the referenced motions.

{¶ 29} On February 28, 2024, the trial court issued a detailed opinion denying Esmail's motion for a new trial. It further granted Parvin's motion in part, amending its earlier order with respect to matters not pertinent to this appeal. Specifically, it amended language to include a reference to "rights to real property" in addition to merely "real estate," and it clarified that it did not intend, in its original judgment entry, to award attorneys' fees or litigation expenses.

{¶ 30} Esmail timely appealed the trial court's February 28, 2024 judgment entry denying his motion for a new trial. Neither party appealed the trial court's limited grant of Parvin's motion for relief from judgment and/or clarification. The parties' appeals were consolidated for resolution.

## II. Law and Analysis

{¶ 31} We "generally review a trial court's determination in domestic relations cases for an abuse of discretion." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 63 (8th Dist.), citing *Holcomb v. Holcomb*, 42 Ohio St.3d 128, 130 (1989). In *Hunter*, we noted that "[d]omestic relations courts must have discretion to do what is equitable upon the facts and circumstances of each divorce case." *Hunter* at ¶ 63, citing *Booth v. Booth*, 44 Ohio St.3d 142, 144 (1989).

{¶ 32} A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter* at ¶ 64, citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse

of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). Where the trial court record "contains competent, credible evidence to support the trial court's decision," there is no abuse of discretion. *Hunter* at ¶ 64, citing *Trolli v. Trolli*, 2015-Ohio-4487, ¶ 29 (8th Dist.). We are not permitted to substitute our judgment for the judgment of the trial court. *Hunter* at ¶ 64, citing *Vannucci v. Schneider*, 2018-Ohio-1294, ¶ 22 (8th Dist.).

{¶ 33} Esmail raises five assignments of error for our review. In her cross-appeal, Parvin raises two assignments of error.

## A. Esmail's Assignments of Error

## 1. Marriage Termination Date

{¶ 34} In his first assignment of error, Esmail argues that the trial court erred as a matter of law and abused its discretion by failing to use the parties' date of separation, May 1, 2017, as the de facto date of termination of their marriage. Parvin argues the trial court correctly exercised its discretion in selecting the date of final hearing, October 11, 2023 — the statutory default — as the most equitable marriage termination date.

{¶ 35} "The date of termination of marriage is presumed to be the date of the final hearing in the divorce case." *W.G. v. D.G.*, 2024-Ohio-1690, ¶ 11 (8th Dist.), citing *O'Brien v. O'Brien*, 2008-Ohio-1098, ¶ 40 (8th Dist.). *See also Machen v. Miller*, 2024-Ohio-1270 (8th Dist.). In *Machen*, we noted that the Revised Code generally defines the term "during the marriage" as "from the date of the marriage

through the date of the final hearing in an action for divorce or in an action for legal separation," but further states that if the trial court finds this inequitable, "the court may select dates that it considers equitable in determining marital property." *Id.* at ¶ 47, quoting R.C. 3105.171(A)(2)(a)-(b). This is commonly referred to as a "de facto termination date." *W.G.* at ¶ 12; *Machen* at ¶ 48.

{¶ 36} "Ohio courts," we wrote in *Machen*, "have held that a de facto termination of marriage date 'must be clear and bilateral, not unilateral.'" *Id.* at ¶ 48, quoting *Day v. Day*, 40 Ohio App.3d 155, 158 (10th Dist. 1988); *see also W.G.* at ¶ 12 ("[A] trial court may use a de facto date of termination if the evidence 'clearly and bilaterally shows that it is appropriate based on the totality of the circumstances.'"), quoting *Bailey v. Bailey*, 2012-Ohio-5073, ¶ 13 (8th Dist.). We have "cautioned that a de facto date should not be used unless the 'evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances.'" *Smith v. Smith*, 2022-Ohio-299, ¶ 25 (8th Dist.), quoting *Brown v. Brown*, 2014-Ohio-2402, ¶ 9 (8th Dist.). "In other words, a unilateral decision 'of one spouse to leave the marital residence does not, in and of itself, constitute a de facto termination of marriage.'" *Machen* at ¶ 48, quoting *Dill v. Dill*, 2008-Ohio-5310, ¶ 11 (3d Dist.).

{¶ 37} "*Dill* appears to be the foremost case in Ohio to set forth a nonexclusive list of factors to consider when analyzing de facto termination of marriage dates." *Machen* at ¶ 48. The *Dill* Court specified several factors to guide trial courts in determining whether a de facto termination date is equitable:

(1) the parties separated on less than friendly terms; (2) the parties believed the marriage ended prior to the hearing; (3) either party cohabited with another person during the separation; (4) the parties were intimately involved during the separation; (5) the parties lived as husband and wife during the separation; (6) the parties maintained separate residences; (7) the parties utilized separate bank accounts or were/were not financially intertwined (with the exception of temporary orders); (8) either party attempted to reconcile; (9) either party retained counsel; and (10) the parties attended social functions together or vacationed together.

*Dill* at ¶ 11. Furthermore, "the *Dill* court stated that none of the factors are dispositive; 'rather, the trial court must determine the relative equities on a case-by-case basis.'" *W.G.* at ¶ 15, quoting *Dill* at ¶ 11.

{¶ 38} In rejecting a de facto termination of marriage date in favor of the statutory presumption, the trial court relied principally on the couple's continuing financial entanglements in the form of filing joint tax returns and also testimony that the decision to separate was not bilateral, but rather "the result of *unilateral* action by [Parvin]." (Emphasis in original.) The trial court cited *Brown* for two propositions: First, "that a de facto date should not be used unless the 'evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances'"; and second, that "a court should not use a de facto date based only on the fact that one spouse has vacated the marital home." *Id.* at ¶ 9.

{¶ 39} Based upon these factors, the trial court found it would be equitable to fix the termination date as the date of the final hearing. The court further noted that if it chose instead to accept Esmail's proposed de facto separation date of May 1, 2017, it would essentially be left in the dark with respect to the division of property.

The trial court wrote that it would not "be able to divide the marital property of the Parties as of that date as no evidence was presented as to what property the Parties possessed at that time."

{¶ 40} "The trial court has broad discretion in choosing the appropriate marriage termination date, and this decision should not be disturbed on appeal absent an abuse of that discretion." *Smith*, 2022-Ohio-299, at ¶ 25 (8th Dist). "A court's decision to use the date of the final hearing or a de facto date is discretionary and will not be reversed on appeal absent an abuse of discretion." *O'Brien*, 2008-Ohio-1098, at ¶ 41 (8th Dist.); *see also W.G.*, 2024-Ohio-1690, at ¶ 12 (8th Dist.). Here, we cannot find that the trial court abused its discretion in selecting the date of final hearing as the most equitable marriage termination date.

{¶ 41} The trial court did not cite *Dill* or address the factors one by one, and we must acknowledge that in our review of the record, some *Dill* checkmarks land in the de facto column: The parties were not intimate after their separation. They maintained separate residences. They did not vacation or attend social functions together. As discussed above, however, the trial court focused on the parties' financial entanglements, such as continued filing of joint tax returns, as well as evidence suggesting the decision to end the marriage was unilateral rather than bilateral.

{¶ 42} With respect to tax returns, *Machen*, 2024-Ohio-1270 (8th Dist.), is instructive. In that case, we found that the trial court abused its discretion in finding the marriage terminated on the date of hearing, November 4, 2021, rather than

using a de facto termination date of November 30, 2018, when the wife filed for divorce. In discussing financial entanglements, we noted that "the parties began filing separate tax returns for 2018, which is when Wife moved out of the marital residence," and that "[e]vidence in the record also shows that the parties filed separate tax returns for 2019 and 2020." *Machen* at ¶ 52. Here, by contrast, the parties consistently filed joint tax returns, including their 2022 tax return — filed in 2023, the same year as the trial. Moreover, the record reflects continuing financial entanglements in other respects. Parvin testified she first opened her own bank account in January 2019, nearly two years after the separation, and that Esmail continued to pay all of her credit card bills. In June 2021, Esmail unilaterally sold the marital home, unilaterally designated a portion of the proceeds as Parvin's share, and sent her payment in the amount of $254,874.13. Indeed, Esmail's third assignment of error contends that the trial court erred by failing to grant him "credit for direct payments made to [Parvin] *during the divorce proceedings*." (Emphasis added.)

{¶ 43} Furthermore, while the trial court did not address attempts at reconciliation in its opinion, that particular *Dill* factor, i.e., whether "*either* party attempted to reconcile," illuminates whether the separation in this case was unilateral versus bilateral. (Emphasis added.) *Dill*, 2008-Ohio-5310, at ¶ 11 (3d Dist.). Although there was testimony that the parties argued just prior to the split in May 2017 and upon Parvin's return from Iran, Esmail testified that after the separation he sent Parvin "more than 250 e-mails" totaling some 800 printed pages.

He said at trial that he "did make every attempt to reconcile with her." He stated he "wanted to have her come back home; she didn't." He testified he was concerned about how long Parvin could continue living with their adult daughter, which was one reason "why I wanted to get us back together." This suggests a unilateral decision by Parvin to terminate the marriage rather than a bilateral decision by both Esmail and Parvin, and therefore supports the trial court's ultimate determination that a marriage termination date coinciding with the final hearing was equitable.

{¶ 44} Finally, "the presence or absence of reliable data concerning the value of the parties' assets is probably the most significant factor the court must consider when selecting a de facto termination date." *Saks v. Riga*, 2014-Ohio-4930, ¶ 10 (8th Dist.). *See also Machen* at ¶ 52. In *Saks*, we found that "it would have been unreasonable for the court to select an earlier date if the necessary information to make an equitable distribution was not available at that time." *Saks* at ¶ 10. In *Machen*, we noted "that an abundance of exhibits entered into evidence by both parties at trial contain[ed] financial documents concerning the parties' marital property dating back to at least 2017," and therefore that "the trial court had reliable data regarding the parties' finances dating back to at least 2017." *Machen* at ¶ 52.

{¶ 45} In the present case, however, nothing in the record suggests that Esmail or Parvin provided an inventory, valuation, or other evidence of the parties' marital property, whether that be real estate, financial accounts, or other assets, as of Esmail's proposed de facto termination date of May 1, 2017. Accordingly, the trial court did not abuse its discretion when it declined to use a de facto termination date

where, in its words, it would not "be able to divide the marital property of the Parties as of [May 1, 2017] as no evidence was presented as to what property the Parties possessed at that time." In its February 28, 2024 order denying Esmail's motion for a new trial, the trial court reiterated that "neither party provided any evidence of the value of any of the assets that would have supported or been necessary to implement a *de facto* termination date of the Parties' marriage." (Emphasis in original.)

{¶ 46} In *Machen*, 2024-Ohio-1270 (8th Dist.), we described the magistrate's designation of the termination of marriage date as "summary," and noted that the "court made no findings of fact and provided no written analysis regarding [that] determination." *Id*. at ¶ 49. We then reversed the trial court after concluding that "[o]verwhelming evidence in the record shows that all ten of the *Dill* factors, in addition to other relevant factors, weigh in favor of a de facto termination of marriage date being equitable." *Id*. at ¶ 53. As discussed above, the circumstances in this case are markedly different, and the trial court supported its decision in two thoughtful opinions, namely, the judgment entry of divorce and the journal entry denying Esmail's motion for a new trial. After reviewing the record, we find and conclude that the trial court did not abuse its discretion or err as a matter of law in rejecting a de facto marriage termination date of May 1, 2017, in favor of the final hearing date, October 11, 2023. Esmail's first assignment of error is overruled.

## 2. Retroactive Modification of Temporary Spousal-Support Order

{¶ 47} In his second assignment of error, Esmail argues that the trial court erred as a matter of law and abused its discretion by failing to retroactively modify

the temporary spousal-support order premised upon his retirement. As discussed above, by entry dated March 10, 2022, in case number DR-19-378176, the trial court ordered Esmail to pay temporary support of $5,000 per month retroactive to January 1, 2020. After crediting Esmail $45,000 for direct payments made to Parvin in 2020, the court found that it left an arrearage of $90,000. The court ordered that Esmail pay an additional $2,000 per month towards the arrearage until paid in full.

{¶ 48} Esmail filed a Civ.R. 75(N)(2) motion for hearing the next day, March 11, 2022. In his motion, Esmail requested a full evidentiary hearing, arguing "that the facts and circumstances do not justify the award enumerated in the Order of this Court." The motion was not premised on Esmail's retirement. It could not have been; Esmail claims he retired in September 2022, which is several months after he filed his Civ.R. 75(N)(2) motion.

{¶ 49} There is no dispute that the trial court never held a hearing on Esmail's Civ.R. 75(N)(2) motion for hearing. That does not, however, mean the trial court automatically committed reversible error. The trial court addressed this issue in detail in its February 28, 2024 order denying Esmail's motion for a new trial.

{¶ 50} The trial court first noted that Esmail filed his Civ.R. 75(N)(2) request for hearing in the initial divorce proceeding, i.e., case number DR-19-378176. That action was later dismissed without prejudice by joint notice filed June 22, 2023, with the parties agreeing to reserve the right to prosecute any motions, objections, and other claims pending in the 2019 action in the refiled 2023 action.

{¶ 51} The trial court found that Esmail, however, did not "prosecute or otherwise reference" the Civ.R. 75 motion until his closing argument brief following trial in the refiled action.[2] More specifically, the February 28, 2024 journal entry indicates that after one or two aborted hearing dates on the motion in case number DR-19-378176, "the attorneys told the Magistrate that they intended to resolve the matter by way of an agreement and a hearing was not necessary." While there is no other reference in the record to these purported conversations with a court magistrate, the trial court went on to state — and our review of the record confirms — that Esmail took no further steps to prosecute his Civ.R. 75(N)(2) motion prior to the dismissal of the 2019 action on June 22, 2023, "almost a year after the last scheduled hearing on the motion." (Feb. 28, 2024 journal entry at 3.) The record also supports the trial court's conclusion that apart from mentioning it in his written closing argument, Esmail did not prosecute his Civ.R. 75(N)(2) motion in case number DR-23-395292.

{¶ 52} As noted above, "it is clear that a Civ.R. 75(N)(2) hearing was not completed in this matter." *Chattree v. Chattree*, 2014-Ohio-489, ¶ 63 (8th Dist.). The trial court quoted *Chattree* extensively in its decision denying Esmail's motion for a new trial, concluding that Esmail's failure to prosecute his Civ.R. 75(N)(2)

---

[2] In his closing argument brief, Esmail argued, without citing authority, that the trial court's 2022 temporary support order was void ab initio due to the failure to hold a hearing. Esmail's counsel did mention the Civ.R. 75(N)(2) motion during the second day of trial (*see, e.g.*, Oct. 12, 2023 tr. 53-54, 85-86), but these were merely complaints that no hearing had been held. At no point during the trial did Esmail give any indication that he wished to prosecute the motion at that time.

motion in either the 2019 case or the 2023 case constituted invited error. *See Chattree* at ¶ 63 ("The invited error doctrine states that 'a party is not entitled to take advantage of an error that he himself invited or induced.'"), quoting *State ex rel. Kline v. Carroll*, 2002-Ohio-4849, ¶ 27.

{¶ 53} In *Chattree*, we further held that because the issue of temporary support may be litigated at trial, "'the trial may constitute the Civ.R. 75(N)(2) hearing on temporary support orders.'" *Id.* at ¶ 64, quoting *Thorp v. Thorp*, 2011-Ohio-1015, ¶ 39 (11th Dist.); *see also Doody v. Doody*, 2007-Ohio-2567, ¶ 44 (11th Dist.). The courts in both *Doody* and *Thorp* noted that the failure to hold a Civ.R. 75(N)(2) hearing was not necessarily reversible error, i.e., that the movant must "demonstrate that he was prejudiced by the failure of the court to hold a hearing." *Chattree* at ¶ 64, citing *Thorp* at ¶ 39. This can be a daunting task where, as noted above, a litigant has the opportunity to address the issue of temporary support during the trial itself. *Chattree* at ¶ 64; *Thorp* at ¶ 39.

{¶ 54} In its February 28, 2024 order, the trial court further noted that Esmail appeared "to be conflating his 75(N) Motion with a Motion to Modify Temporary Support which is generally filed due to a change in circumstances." (Feb. 28, 2024 journal entry at 4.) The trial court observed, correctly, that no motion to modify temporary support had been filed in either the 2019 or 2023 action and that the issue of retroactive modification of the temporary support order was not raised at trial.

**{¶ 55}** On appeal, Esmail continues to mix the two concepts, citing numerous cases regarding the retroactive modification of a spousal-support order. We reject Esmail's arguments for the same reason the trial court rejected them in denying his motion for a new trial. A motion to modify is typically based on a change of circumstances. *See, e.g., Anderson-Fye v. Mullinax-Fye*, 2024-Ohio-5909, ¶ 23 (8th Dist.) (motion to modify filed nearly two years after initial agreed support order alleged "substantial change in circumstances" based upon "a change in the parties' income and a change in the children's expenses"); *see also La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 118-120 (8th Dist.) (court entered temporary support order on December 13, 2017, and wife filed motion to modify on November 13, 2020, alleging substantial change in circumstances, including "change in income of the parties"). Here, Esmail filed his Civ.R. 75(N) motion the day after the trial court entered its temporary support order. While Esmail had asked for an evidentiary hearing on the temporary support order, his Civ.R. 75(N) motion referenced no change in circumstances, and indeed his retirement — the change in circumstances to which he now points — occurred months later. Esmail not only failed to raise the issue of retroactive modification of the support order at trial, but never filed any motion to modify in the first instance. Finally, the trial court noted in its order denying Esmail's motion for a new trial that his income following retirement remained substantial, a fact supported by the record.

{¶ 56} The trial court did not abuse its discretion or err as a matter of law by declining to retroactively modify the spousal-support order based on Esmail's retirement. Esmail's second assignment of error is overruled.

### 3. Credit for Payments Made During Divorce Proceedings

{¶ 57} In his third assignment of error, Esmail contends the trial court erred as a matter of law and abused its discretion by failing to grant him credit for direct payments made to Parvin during the pendency of the divorce proceedings, resulting in an unjust and inequitable division of property. In a nutshell, Esmail argues "that he should have been granted the sum of $410,551.76 from . . . his existing bank accounts to account for the $410,551.76 that was advanced to Parvin during the proceedings," and that the trial court erred by allowing Parvin to keep her financial accounts while requiring Esmail to divide his. (Esmail's reply brief at p. 5.)

{¶ 58} The trial court's most recent — and most detailed — discussion of the issue of credit for direct payments is contained in its February 28, 2024 journal entry denying Esmail's motion for a new trial. In his motion for a new trial, Esmail argued that the trial court's judgment entry of divorce "fails to acknowledge the funds paid to [Parvin] and failed to give [Esmail] credit for any payments to [Parvin] when determining the temporary support arrearages."

{¶ 59} While Esmail's motion for a new trial and the trial court's discussion referenced support arrearages, the trial court specifically addressed the subject of credit for direct payments. Referencing Esmail's own exhibits, the trial court

concluded that the $410,000[3] paid by Esmail to Parvin "was for the purposes of property division, including [Parvin's] share of the proceeds of the sale of the marital residence and other marital property." It stated that it "clearly addressed these funds in the context of the parties' property division," finding that Parvin's JP Morgan Chase account appeared to have "solely been funded by property division payments made to her by [Esmail]," and finding it equitable for Parvin to retain that JP Morgan Chase account and for Esmail to retain his University of Toledo Federal Credit Union account. The trial court further held:

> For [Esmail] to now say that [Parvin] received this interim property division payment as part of [Esmail's] interim or temporary support obligation would effectively allow [Esmail] double credit for these payments. Further, [Esmail] fails to assert any legal argument related to disbursements made on an interim basis for the purpose of property division affecting a temporary support order.

In her appellate brief, Parvin aptly summarizes the trial court's conclusion: "[T]he trial court . . . determined that the majority of the payments were advancements on [Parvin's] property division from [Esmail's] unilateral liquidation of marital property in violation of the trial court's Mutual Restraining Order." (Parvin's opening brief at p. 16-17.)

{¶ 60} Upon review of the record, we find no abuse of discretion by the trial court. The record reflects that in March 2022, the trial court gave Esmail credit for $45,000 already paid to Parvin. While it deferred the issue of Esmail's $254,874.13

---

[3] The trial court used the round number in its decision. The parties have raised no arguments to suggest it meant anything other than the full amount of direct payments. The total is not in dispute.

payment to Parvin for her share of the unauthorized sale of the marital home, holding it would "not be taken into consideration as payment on temporary support order," the trial court took that payment into account in its December 2023 judgment entry of divorce, where it referenced Parvin's JP Morgan Chase account as being funded "by property division payments made to her" by Esmail. The trial court's order on Esmail's motion for a new trial clarifies this holding even further; it carefully explained that its decision took into account the $410,000 in payments made by Esmail to Parvin during the divorce proceedings.

{¶ 61} In his final argument relating to this assignment of error, Esmail appears to shift gears. Rather than further elaborating on his arguments regarding credit for interim payments, he cites *Zona v. Zona*, 2005-Ohio-5194 (9th Dist.), for the proposition that the trial court erred by failing to place a value on the parties' marital assets, including their financial accounts, before dividing the marital property. Our review of case law, however, indicates that we have not fully adopted the Ninth District's holding in *Zona*. While we have cited *Zona* in cases involving the division of marital assets, we have nevertheless held that "when a party fails to present evidence as to the value of an item, it is akin to an invited error and that party has waived the right to appeal in regard to that asset." *Tyler v. Tyler*, 2010-Ohio-1428, ¶ 31 (8th Dist.). *See also Gray v. Gray*, 2011-Ohio-4091, ¶ 15 (8th Dist.); *Davis v. Davis*, 2003-Ohio-4657, ¶ 18 (8th Dist.) (husband waived arguments regarding valuation of marital property where he failed to submit evidence of valuation at trial). We held in *Gray* that "'if a party fails to present sufficient

evidence of valuation, they have presumptively waived their right to appeal the distribution of those assets since the trial court can only make decisions based on the evidence presented and is not required to order submission of additional evidence.'" *Gray* at ¶ 15, quoting *Davis* at ¶ 18.

{¶ 62} Esmail has cited nothing in the record indicating he submitted valuation evidence at trial that would be relevant to this assignment of error. Any contention that the trial court failed to place a precise value on certain marital assets was invited error.

{¶ 63} The record reflects that there was competent, credible evidence indicating the trial court properly credited Esmail for payments made during the pendency of the divorce proceedings. On this record, the trial court did not abuse its discretion or err as a matter of law. Esmail's third assignment of error is overruled.

### 4. Time Restrictions on Presentation of Evidence

{¶ 64} In his fourth assignment of error, Esmail argues that the trial court erred as a matter of law and abused its discretion by placing arbitrary time restrictions on the presentation of evidence, thereby violating his due process rights.

{¶ 65} As discussed above, on the morning of trial, the court docketed a journal entry ordering that the direct examination of witnesses "shall be limited to 60 minutes per witness" and cross-examination "shall be limited to 30 minutes per witness." We have addressed this issue in multiple recent decisions and have held that "the limitation does not constitute an abuse of discretion without a

demonstration of what evidence a party was prohibited from presenting because of the limitation and how the party was prejudiced." *Anderson-Fye*, 2024-Ohio-5909, at ¶ 108 (8th Dist.), citing *M.F.S. v. B.T.S.*, 2024-Ohio-4680, ¶ 39 (8th Dist.), and *Machen*, 2024-Ohio-1270, at ¶ 58 (8th Dist.).

{¶ 66} As in *Anderson-Fye*, where we rejected a due-process argument, "our review of the record reveals that both parties were afforded approximately the same time in which to present evidence and both parties were afforded the opportunity to conduct direct examination, cross-examination and recross examination of witnesses." *Anderson-Fye* at ¶ 110. The trial transcript reflects that the court kept careful track of time limitations and did not favor one side over the other. At one point, in fact, Esmail's counsel remarked that he was "glad [he] saved 20 minutes," and the trial court corrected him by saying "half an hour, I think." (Oct. 11, 2024 tr. 91-92.) On the second day of trial, Esmail's counsel noted he had ten minutes reserved for cross-examination, the court indicated it would "add ten to it." (Oct. 12, 2024 tr. 32-33.) Minutes later, the trial court stopped the clock for Esmail's counsel and then reminded him how much time he had left. (Oct. 12, 2024 tr. 37-38.)

{¶ 67} In light of this, and because Esmail has not demonstrated what evidence he was prohibited from presenting and how he was prejudiced, we find that the trial court did not abuse its discretion or err as a matter of law in mandating or enforcing the time limits for direct and cross-examination. *See Hunter*, 2025-Ohio-366, at ¶ 121 (8th Dist.). Esmail's fourth assignment of error is overruled.

## 5. Denial of Motion for New Trial

{¶ 68} In his fifth assignment of error, Esmail argues that the trial court erred as a matter of law and abused its discretion by denying his motion for a new trial.

{¶ 69} "The standard of review we apply to a trial court's ruling on a Civ.R. 59 motion for new trial depends upon the grounds for the motion." *Yenni v. Yenni*, 2022-Ohio-2867, ¶ 60 (8th Dist.), citing *Robinson v. Turoczy Bonding Co.*, 2016-Ohio-7397, ¶ 23 (8th Dist.). As we explained in *Yenni*:

> "A motion for new trial brought under Civ.R. 59(A)(1), (2), (3), (4), (5), (6), or (8) is reviewed for an abuse of discretion. *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 12, 13; *Johnson v. Johnson*, 5th Dist. Stark No. 2015CA00076, 2015-Ohio-4748, ¶ 16-17; *GMS Mgt. Co. v. Coulter*, 11th Dist. Lake No. 2005-L-071, 2006-Ohio-1263, ¶ 20-21. A motion for new trial brought under Civ.R. 59(A)(7) or (9), is reviewed de novo. *Gateway Consultants Group* at ¶ 12, 22."

*Yenni* at ¶ 60, quoting *Moore v. Moore*, 2018-Ohio-1545, ¶ 14 (6th Dist.). "A new trial may be granted in the sound discretion of the court for good cause shown, and the court's ruling will not be reversed absent an abuse of that discretion." *Trolli*, 2015-Ohio-4487, at ¶ 60-61 (8th Dist.); *see also Sarka v. Love*, 2005-Ohio-6362, ¶ 18 (8th Dist.); *Walpole v. Walpole*, 2013-Ohio-3529, ¶ 91 (8th Dist.).

{¶ 70} Esmail's motion for a new trial essentially recited all of Civ.R. 59, but highlighted only certain provisions, namely Civ.R. 59(A)(1) ("Irregularity in the proceedings"); Civ.R. 59(A)(7) ("The judgment is contrary to law"); and the

concluding catchall ("In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.").

{¶ 71} A review of Esmail's arguments in his new-trial motion reveals that they are intertwined and disposed of by our resolution of his other assignments of error. His argument regarding credit for direct payments is addressed in our discussion of his third assignment of error. Esmail's arguments regarding the trial court's failure to hold a hearing after he filed a Civ.R. 75(N)(2) motion and to terminate his temporary support obligation upon his retirement are addressed in our discussion of his second assignment of error. The issue of a de facto marriage termination date is addressed in our discussion of his first assignment of error.

{¶ 72} We have overruled all of the referenced assignments of error, finding in each instance that the trial court did not abuse its discretion or err as a matter of law. These dispositions render Esmail's fifth assignment of error moot. App.R. 12(A)(1)(c); *Rex v. Conner*, 2003-Ohio-4561, ¶ 80-82 (8th Dist.). Accordingly, Esmail's fifth assignment of error is overruled.

## B. Parvin's Assignments of Error

### 1. Marriage Inception Date

{¶ 73} In her first assignment of error, Parvin argues that the trial court erred and abused its discretion by finding that the parties were married on September 8, 1989, rather than when they privately exchanged vows in an Islamic ceremony sometime in 1981.

{¶ 74} At trial, Parvin testified that the parties were Islamically married in the "early part of 1981, about February, March." (Oct. 11, 2024 tr. 127-128.) The trial court instead chose the date of legal marriage, September 8, 1989, as the marriage inception date, specifically noting that it "was not presented with any evidence that it would be *inequitable* to use the date of legal marriage." (Emphasis added.) That theme — the lack of evidence that the choice of the legal marriage date would be *inequitable* — is continued in appellate briefing: Even when given a fresh opportunity to point to record evidence suggesting the selection of a 1989 marriage inception date instead of 1981 somehow prejudiced Parvin, she offers nothing.

{¶ 75} Parvin's citation to *Al-Mubarak v. Chraibi*, 2015-Ohio-1018 (8th Dist.), is inapposite. In that case, we held that "'R.C. 3105.171(A)(2)(b) provides the court with the authority to select a date other than the ceremonial wedding date for purposes of equitably determining what comprises the marital estate for a division of property assessment.'" *Id*. at ¶ 26, quoting *Bryan v. Bryan*, 2012-Ohio-3691, ¶ 11 (8th Dist.). In that case, we upheld the trial court's decision to use a 2001 marriage inception date — when the parties began cohabiting and representing themselves to the community as husband and wife — rather than when they were legally married in 2010. Unlike here, however, the couple had a child before the date of their legal marriage. In addition, by 2005, several years before they became legally married, "Husband had a very successful cardiologist practice." *Id*. at ¶ 13. This is markedly different from the present case, in which there is no suggestion, including by Parvin

herself, that it would make any difference in the division of marital property were the court to find they were married in 1981 versus 1989.

{¶ 76} Upon our review of the record, we find that the trial court did not err as a matter of law or abuse its discretion in selecting the date of the parties' legal marriage as the marriage inception date. Parvin's first assignment of error is overruled.

## 2. STRS Pension, Spousal Support, Division of Property

{¶ 77} In her second assignment of error, Parvin argues that the trial court erred and abused its discretion by (a) failing to divide Esmail's STRS pension, (b) only ordering spousal support in the amount of $1,500 per month, and/or by (c) failing to award Parvin additional marital property to bring equity between the parties.

{¶ 78} "'The goal of spousal support is to reach an equitable result.'" *La Spisa*, 2023-Ohio-3467, at ¶ 125 (8th Dist.), quoting *Kehoe v. Kehoe*, 2013-Ohio-4907, ¶ 13 (8th Dist.). While the trial court is required to consider all 14 factors listed in R.C. 3105.18(C), it must not consider each factor in isolation; indeed, "'there is no set mathematical formula to reach [the] goal'" of an equitable result. *La Spisa* at ¶ 125, quoting *Kehoe* at ¶ 13.

{¶ 79} Here, in ordering spousal support in the amount of $1,500 per month, the trial court expressly noted that it had considered all of the factors set forth in R.C. 3105.18(C), in particular the duration of the marriage; relative earning abilities of the parties; the ages and physical, mental and emotional conditions of the parties;

and the retirement benefits of the parties. It specifically found that Esmail was now retired and is receiving regular STRS disbursements. The monthly payment of $1,500 is to continue for the remainder of the parties' lives, absent Parvin's cohabitation or remarriage. The trial court further retained jurisdiction to modify the award.

{¶ 80} While Parvin's second assignment of error is broken into subparts, the gist is that the monthly support total of $1,500 is too low, and the subparts are more correctly interpreted as ways to — in her view — correctively "bring equity between the parties." She suggests that the trial court could have divided Esmail's STRS pension, that it could have ordered a larger monthly spousal-support payment, or that it could have awarded her additional marital property.

{¶ 81} Parvin is correct that according to the Ohio Supreme Court, "[a] vested pension plan accumulated during marriage is a marital asset and must be considered in conjunction with other factors listed under R.C. 3105.18 and all other relevant factors in dividing marital assets and liabilities." *Holcomb*, 44 Ohio St.3d at 132. In this context, however, the key word is "considered." Here, the trial court expressly considered Esmail's STRS pension in its analysis of the R.C. 3105.18 factors. We find it instructive that in *Holcomb*, the court found that a trial court "is not required to divide the pension benefits as a matter of law," but "must consider the pension plan as a marital asset in reaching an equitable division of property." *Id*. at 132. In this case, the trial court did exactly that, both when it discussed the R.C. 3105.18 factors and earlier in its decision, in its discussion of retirement assets,

where it essentially determined that Esmail's STRS benefits would fund his spousal-support obligation.

{¶ 82} Parvin acknowledges that she is entitled to one-half of Esmail's deferred compensation account (valued, before division, at approximately $771,000), as well as one-half of Esmail's Signature Bank account (valued, before division, at approximately $386,000), all the money in her JP Morgan Chase account, her one-half share of the multiple parcels of real estate yet to be liquidated, one-half of the New York Life annuity and life insurance policies, and the $190,000 support arrearage, which has been reduced for judgment upon which execution may issue. She does not, however, delve into factors cited by the trial court, such as "the ages and physical, mental and emotional conditions of the parties." It is undisputed that Esmail is older than Parvin; he was 70 at the time of trial. Moreover, Esmail's testimony that he suffers from health issues, including macular degeneration and pancreatic atrophy, was unrebutted.

{¶ 83} Parvin further acknowledges, in her final brief, that Esmail's "STRS benefits function both as income and as a divisible marital asset, *giving the trial court multiple options for addressing it in a judgment entry of divorce.*" (Emphasis added.) (Parvin's reply brief at p. 7.) The record reflects that even though the trial court did not select Parvin's preferred option, it exercised sound discretion in addressing the STRS benefits in its judgment entry of divorce. As we noted above, "[t]he term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter*, 2025-Ohio-366, at ¶ 64 (8th Dist.). In

addition to dividing the parties' marital property in an equitable fashion, the trial court considered the statutory factors pertinent to a spousal-support award, and that award was supported by competent, credible evidence. We find that the trial court did not act in an unreasonable, arbitrary, or unconscionable manner. We find no abuse of discretion. Parvin's second assignment of error is overruled.

{¶ 84} Judgment affirmed.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

LISA B. FORBES, P.J., and
SEAN C. GALLAGHER, J., CONCUR